**SCOTT BRASS, INC.**

v.

**WIRE AND METAL SPECIALTIES CORPORATION.**

**METAL SYSTEMS, INC.**

v.

**G. G. GREENE, INCORPORATED and Wire and Metal Specialties Corporation.**

Civ. A. Nos. 4730, 4731.

United States District Court, D. Rhode Island.

June 8, 1972.

**712**

David A. Schecter, Winograd, Shine & Zacks, Providence, R. I., for plaintiffs.

Brian T. Callahan, Medford, Mass., Edward J. Regan, Providence, R. I., for defendants.

### OPINION

PETTINE, Chief Judge.

In these actions damages are sought for breach of alleged agreements between the plaintiffs and the defendants concerning the manufacture and sale of metal and metal products. Jurisdiction is based upon diversity of citizenship and an amount in controversy exceeding $10,000, exclusive of costs, interest and fees. 28 U.S.C. Sec. 1332. The plaintiffs are Rhode Island corporations and the defendants are Pennsylvania corporations.

The defendants have moved to dismiss the complaints, claiming that (a) this court lacks *in personam* jurisdiction over the defendants, and (b) the defendants were not properly served with process.

### *In Personam Jurisdiction*

The statutory basis for jurisdiction by the courts of Rhode Island over non-resident individuals and foreign corporations is Rhode Island's so-called "long arm" statute, Sec. 9–5–33, Gen.Laws R. I.1956, as amended:

> "Jurisdiction over foreign corporations and over nonresident individuals, partnerships, or associations.

> —Every foreign corporation, every individual not a resident of this state or his executor or administrator, and every partnership or association, composed of any person or persons, not such residents, that shall have the necessary minimum contacts with the state of Rhode Island, shall be subject to the jurisdiction of the state of Rhode Island, and the courts of this state shall hold such foreign corporations and such nonresident individuals or their executors or administrators, and such partnerships or associations amenable to suit in Rhode Island in every case not contrary to the provisions of the constitution or laws of the United States."

The Rhode Island long arm statute was adopted in harmony with the "minimum contacts" concept first enunciated by the United States Supreme Court in International Shoe Co. v. State of Washington et al., 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945):

> "Historically the jurisdiction of courts to render judgment in personam is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. Pennoyer v. Neff [5 Otto 714], 95 U.S. 714, 733, 24 L.Ed. 565. But now that the capias ad respondendum has given way to personal service of summons or other forms of notice, due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the fo-

rum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " 326 U.S. at 316, 66 S.Ct. at 158.

As this court observed shortly after the passage of the Rhode Island long arm statute, "(f)rom the plain language of the statute it will be seen that the legislature of Rhode Island has chosen to exercise jurisdiction over foreign corporations up to the constitutional limitations." Del Sesto v. Trans World Airlines, Inc., 201 F.Supp. 879 (1962). This position was reaffirmed by the Rhode Island Supreme Court in Conn v. ITT Aetna Finance Company et al., 105 R.I. 397, 252 A.2d 184 (1969):

> "The long-arm statute . . . made foreign corporations and nonresident individuals having the necessary 'minimum contacts' with this state amenable to the jurisdiction of our courts subject only to whatever limitations might be imposed by the constitution or laws of the United States; in substance and in effect, it empowers our courts '. . . to exercise jurisdiction over foreign corporations up to the constitutional limitation.' " (citing Del Sesto v. Trans World Airlines, Inc., supra)

Although the constitutional limitations on in personam jurisdiction are of federal origin, the question of "minimum contacts" for jurisdictional purposes must be decided in accordance with the law of the state in which the court sits, Westphal v. Stone Manufacturing Co. (D.R.I.1969), 305 F.Supp. 1187, including the experience of state courts as reflected in reported case law. In Conn. v. ITT Aetna Finance Company, supra, the Rhode Island Supreme Court addressed itself, 252 A.2d at 187, to the question of standards for judging "minimum contacts":

> "(N)either the (long arm) statute nor the decisions from which it stems have given us any readily discernible guidelines for determining what are 'minimum contacts,' or for deciding what is encompassed within 'traditional notions of fair play and substantial justice.' At best these are illusive phrases. . . . (T)he task of determining when an exercise of jurisdiction over a nonresident is permissible and when impermissible . . .
>
> '. . . will require an evolutionary process rather than a quick definitive statement, as these terms involve subjective judgments that must be based upon a multitude of variant factors as they are presented in a multitude of cases. The existence or non-existence of the necessary 'minimum contacts' to justify the upholding of personal jurisdiction over foreign corporations under the Fourteenth Amendment as interpreted in the International Shoe Company case must obviously be worked out with reference to the facts of a particular case rather than in a statement of dogmatic rules of all-inclusive principles.' Velandra v. Regie Nationale Des Usines Renault, 6 Cir., 336 F.2d 292, 295.

> It is within the frame of this process that we inquire whether (the defendants) had sufficient 'minimum contacts' with this state to permit our courts to exercise in personam jurisdiction over them."

It is clear that the sufficiency of "minimum contacts" must ultimately be decided on a case by case basis, in the light of the requirements of constitutional due process as developed by federal and state courts. "The totality of the contacts both quantitatively and qualitatively must be considered to the full scope of the periphery of constitutional permissibility." Westphal v. Stone Manufacturing Co., supra, 305 F.Supp. at 1193.

The parties to the instant litigation have submitted affidavits and supporting documentary evidence which depicts in considerable detail the contacts of the defendant corporations with the state of

Rhode Island. The following facts can be reasonably inferred from the record in its present state, and accordingly the court finds such facts for the limited purpose of resolution of the jurisdictional question.

Business contacts between Wire and Metal Specialties Corp. (henceforth "Wire and Metal") [1] and the plaintiffs began early in 1967, when Wire and Metal purchased a quantity of brass metal from Scott Brass Inc. ("Scott Brass"). A payment of $10,000 was made by Wire and Metal to Scott Brass in connection with this purchase.[2] Wire and Metal subsequently purchased brass metal from Scott Brass on several other occasions. Two such purchases, in November of 1967 and December of 1968, were each of the quantity of 200,000 pounds of "cartridge brass." The purchase order submitted in connection with the December 1968 purchase called for Scott Brass to deliver "20,000 lbs. every other week" to Wire and Metal's headquarters in Warren, Pennsylvania.

In 1968, Wire and Metal and Metal Systems, Inc. ("Metal Systems") entered into an agreement whereby Wire and Metal would manufacture "bullet jackets" for Metal Systems in accordance with Metal Systems' obligations to deliver such bullet jackets under a government contract. The court makes no finding as to the place of execution of the agreement, as it appears that the agreement evolved over a period of months, and no document has been produced which can be said to embody the entire agreement.[3]

The terms of the agreement called for:

1. the supplying by Scott Brass of the basic raw materials for the production of the bullet jackets, including coils of steel clad with copper;

2. the manufacture by Wire and Metal of five sets of dies to be used in the production of the bullet jackets, at a cost of $9000 per set; and

3. the production of 500 million bullet jackets by Wire and Metal, at a rate of 80 million jackets per month, and at a price of 70¢ per thousand jackets, or a total price of $350,000.

The dies, although the property of Metal Systems, were to remain at the headquarters of Wire and Metal in Pennsylvania. All acts of manufacturing by Wire and Metal were to be performed in Pennsylvania. Completed bullet jackets were to be delivered by Wire and Metal to the offices of Metal Systems in Rhode Island.

Actual performance fell short of what was contemplated by the agreement. Wire and Metal manufactured several dies to the desired specifications and began producing bullet jackets. Beginning early in 1968, Wire and Metal made numerous shipments of bullet jacket cups and scrap metal to Metal Systems. Wire and Metal also returned allegedly defective coils of clad metal to Scott Brass from time to time. The plaintiffs

1. The contacts of the defendant G. G. Greene Incorporated with the state of Rhode Island are discussed infra, at p. 718.

2. One of the affidavits submitted on behalf of the plaintiffs states that this payment was delivered in person to the place of business of the plaintiffs by James H. Kaltsas, a representative of Wire and Metal. Defendants' affidavits contain a general denial that any representative of Wire and Metal other than its president,

Lynn D. Freeman, ever visited plaintiffs' offices, and a statement that the $10,000 payment was "forwarded" by Mr. Kaltsas to the plaintiffs.

3. The defendants contend that negotiations preliminary to the agreement took place entirely in Pennsylvania. The plaintiffs cite an alleged visit by Lynn D. Freeman and James H. Kaltsas, officers of Wire and Metal, to the offices of the plaintiffs for the purpose of solicitation of plaintiffs' business.

attest to their receipt of the following shipments from Wire and Metal:

1. January 18, 1968, 4445 lbs. of coils

2. July 23, 1968, 22 lbs. of bullet . jacket cups

3. November 22, 1968, 4733 lbs. of coils and 2397 lbs. of scrap metal

4. November 26, 1968, 109 lbs. of bullet jacket cups, 1244 lbs. of coils and 552 lbs. of scrap metal

5. January 16, 1969, 1776 lbs. of scrap metal

6. March 10, 1969, 942 lbs. of coils

7. March 27, 1969, 113 lbs. of coils

The documentary evidence also shows that on Sept. 16, 1968 a "cup punch die" and a "draw die" were shipped to Metal Systems, Inc., and that 6268 lbs. of coils were returned to Metal Systems on October 7, 1968.[4] On August 15, 1969 Wire and Metal sent invoices to Metal Systems and Scott Brass in the respective amounts of $7,362.81 and $8,921.76.

It appears that production and delivery of bullet jackets pursuant to the agreement did not proceed at the anticipated rate because early samples of bullet jackets were of an inferior quality. The plaintiffs and Wire and Metal blamed each other for the unsatisfactory bullet jackets, the plaintiffs contending that Wire and Metal had not properly manufactured the dies, and Wire and Metal claiming that Scott Brass had supplied coils of defective clad metal. Lynn D. Freeman, President of Wire and Metal, made three visits to the headquarters of Metal Systems in Rhode Island in 1969, in connection with attempts by the parties to settle their differences. On one of these occasions Mr. Freeman transported with him to Rhode Island one of the specially manufactured dies, and on another occasion he carried back to Pennsylvania a small amount of material for samples. There were other meetings between Wire and Metal and one or both of the plaintiffs from time to time during the life of their business relationship, and at least one of these meetings may have taken place in Rhode Island. However, most of the communication between the present plaintiffs and Wire and Metal during the years 1967 through 1969 was by telephone, telegram and letter.

As for Rhode Island contacts of Wire and Metal *not* directly connected with the instant litigation, no such contacts have been shown. An affidavit of Mr. Freeman, President of Wire and Metal, dated January 13, 1972, represents, inter alia, the following:

"WIRE AND METAL SPECIALTIES CORPORATION is not qualified to do business in Rhode Island, does not maintain any office or place of business in the State of Rhode Island, has no telephone or other directory listings in the State of Rhode Island, pays no state or local taxes in the State of Rhode Island, has no ownership or other interest in real property in the State of Rhode Island, and none of its officers, agents or members of its board of directors resides in the State of Rhode Island.

. . . WIRE AND METAL SPECIALTIES CORPORATION has never advertised in any Rhode Island newspaper, periodical, radio station or television station, nor in any publication of any kind distributed in the State of Rhode Island.

. . . With respect to its general activities, WIRE AND METAL SPECIALTIES CORPORATION does not manufacture any products in Rhode Island and does not solicit business by sending any salesmen or other personnel into the State of Rhode Island."

Summarizing the contacts tending to favor an exercise of jurisdiction by this court, Wire and Metal made a substantial commitment to a complicated and long-lasting business relationship

---

4. These shipments, apparently made with the authority of Wire and Metal, are evidenced by forms bearing the names "G. G. Greene Incorporated" and "G. G. Greene Corporation." See discussion, p. 718 infra.

with two Rhode Island corporations, a relationship requiring extensive communication and cooperation between Wire and Metal and the Rhode Island companies. Wire and Metal bought in excess of 200 tons of metal from one of said Rhode Island companies and made numerous shipments of a custom-made product to the other. Many thousands of dollars changed hands between Wire and Metal and the Rhode Island companies, and the eventual exchange of nearly half a million dollars was contemplated. The activities of Wire and Metal within the geographical boundaries of Rhode Island included trips by its chief executive officer to Rhode Island in connection with the above transactions.

In support of a dismissal for lack of "minimum contacts" jurisdiction, it must be noted that Wire and Metal had virtually no contacts with the state of Rhode Island beyond those immediately related to its transactions with the plaintiffs. Additionally, Wire and Metal's agreements with the plaintiffs did not call for the performance of any act within the state of Rhode Island, other than the delivery of goods to the headquarters of Metal Systems.

Considering the "totality of the contacts" set forth above, "both quantitatively and qualitatively," the court must decide whether the maintenance of the instant lawsuit against Wire and Metal in a Rhode Island court offends "traditional notions of fair play and substantial justice."

In the last decade there has been much litigation in Rhode Island concerning the scope of "minimum contacts" jurisdiction. This court most recently addressed itself to the "minimum contacts" question in Leesona Corporation v. Concordia Mfg. Co., 312 F.Supp. 392 (1970). *Leesona* was an action by a Massachusetts corporation admitted to do business in Rhode Island and having its principal office in Rhode Island against some sixty corporations located in states along the eastern seaboard. The plaintiff sought declaratory judgment as to the validity of agreements for licensing the defendants to use certain patents owned by the plaintiff in exchange for royalties. In upholding jurisdiction as to each of the defendants, the court noted the following Rhode Island contacts common to all the defendants:

"(1) contracts between plaintiff and each defendant by which each defendant is licensed to use processes and apparatus under (the patents in question), in exchange for which each defendant makes substantial cash payments to plaintiff; (2) final execution of the contracts in Rhode Island; (3) various relations supportive of the central exchange of use to licensee for royalties to licensor, including in particular plaintiff's machinery sales and leasing, plaintiff's development and design program, plaintiff's service and parts sales, plaintiff's instructional program, and plaintiff's account audit methods."

The court then reviewed the similarities and/or distinguishing features of previous Rhode Island cases interpreting "minimum contacts":

"While the court does not find the contacts in this case as compelling as they were in those cases concerning the doing of business here for purposes of profits derived directly from Rhode Island and from which business the particular cause of action arose, e. g., Westphal v. Stone Mfg., 305 F. Supp. 1187 (D.R.I.1969), Rosen v. Savant Instruments, Inc., 264 F.Supp. 232 (E.D.N.Y.1967), nor as compelling as the contacts which induced a Rhode Island citizen to Florida where he was present only for a limited period and was injured, e. g., Forsythe v. Cohen, 305 F.Supp. 1194 (D.R.I.1969), it does not on the other hand, deem this a case of a 'naked buyer-seller relationship,' e. g., Riverhouse Publishing Co. v. Porter, 287 F.Supp. 1 (D.R.I.1968), nor one of an alleged wrong unrelated to this forum in any way and accomplished by a foreign corporation whose local subsidiaries were less than

completely tied to it. Conn. v. ITT Aetna Finance Co., R.I., 252 A.2d 184 (Sup.Ct.R.I.1969). This case is somewhat akin to those cases involving systematic and continuous business contact with this state, e. g., Del Sesto v. Trans World Airlines, Inc., 201 F. Supp. 879 (D.R.I.1962), Samson Cordage Works v. Wellington Puritan Mills, Inc., 303 F.Supp. 155 (D.R.I. 1969), although admittedly it does involve not seller activity here but rather the activity of out-of-state purchasers of Rhode Island properties and services."

■ It is clear from *Leesona* that an exercise of "long arm" jurisdiction is justified where there is evidence of substantial business activity between the Rhode Island plaintiff and the defendant, even though the defendant does not hold itself out for business in any identifiable Rhode Island market, but rather limits its contacts with Rhode Island to its transactions with the plaintiff.

Comparing the facts pertinent to jurisdiction in the instant case and in *Leesona*, the court finds the totality of Wire and Metal's contacts with Rhode Island to be on a level, quantitatively and qualitatively, with those of individual defendants in the *Leesona* case. The essential features of the business relationship between Wire and Metal and the plaintiffs —the exchange of large amounts of money and goods, activity as both buyer and seller by Wire and Metal, a complicated agreement for the production of a product to specification over a substantial period of time—compare favorably for jurisdictional purposes to the contacts found sufficient as to each defendant in *Leesona*—leasing of patent rights from a Rhode Island corporation pursuant to a written contract, execution of the contract in Rhode Island, and the purchase of various goods and services from the plaintiff from time to time in connection with the contract. Admittedly, the finding of "final execution" of a contract in Rhode Island is lacking in the instant case; however, the court

does not feel that this detracts significantly from the "totality" of the contacts picture of the instant defendant.

Among the reported cases in which Rhode Island courts have declined to exercise "long arm" jurisdiction, only one, Riverhouse Publishing Co. v. Porter (D. R.I.1968), 287 F.Supp. 1, is arguably analogous to the instant case. *Riverhouse* was a libel action by a Rhode Island plaintiff against a columnist and a newspaper feature syndicating corporation in connection with a column which appeared in a Rhode Island newspaper. In dismissing the complaint against the syndicator, the court held that syndication arrangements between the Rhode Island newspaper and the syndicator, the only relevant contacts shown by the plaintiff, were not by themselves a sufficient basis for "minimum contacts" jurisdiction:

> "It is the quality and nature of the (defendant's) activity in Rhode Island which the court finds significant. It is nothing more than a contractual relationship—a naked buyer and seller relationship devoid of any duties and responsibilities within this foreign state."

Arguably, the relationship between Wire and Metal and the instant plaintiffs could be characterized as "nothing more than a contractual relationship—a naked buyer and seller relationship devoid of any duties and responsibilities within this foreign state." However, it must be observed that the "contractual relationship" of the instant case is between the *parties* to the litigation, and is, indeed, the subject matter of the litigation. Additionally, the complexity of the relationship between Wire and Metal and the defendants demands that it be recognized as something more than a "naked buyer and seller relationship." Finally, the facts of the recent *Leesona* case are much more similar to the case at bar than are those of *Riverhouse*, and it is with the support of *Leesona* that the court finds that *Riverhouse* is not of application here.

■ Conformity to precedent is but incidental to the fundamental requirement that the contacts in the instant case satisfy the "fair play and substantial justice" test, as set forth supra. With this constitutional standard in mind, the court looks again to the most "physical" of the contacts of Wire and Metal with the state of Rhode Island; they include:

(1) shipment of substantial quantities of metal and metal products into Rhode Island in connection with an agreement which is the focus of this litigation;

(2) business trips to Rhode Island by one or more of the officers of Wire and Metal for the purpose of advancing and protecting the interests of Wire and Metal in the same agreement; and

(3) the tender of a substantial sum of money, perhaps in person by an officer of Wire and Metal, to one of the instant plaintiffs in Rhode Island.

The weight of these contacts, in combination with the more intangible or "long-distance" contacts of Wire and Metal with Rhode Island, compels the conclusion that it does not offend "traditional notions of fair play and substantial justice" to compel Wire and Metal's presence in this jurisdiction to defend the instant claim. It is the ruling of this court that the instant suits were properly brought against Wire and Metal Specialties Corp. pursuant to the provisons of Chap. 9–5–33, General Laws R.I.1956, as amended.

As for G. G. Greene Incorporated, co-defendant of Wire and Metal in Civil Action No. 4731, the complaint names said corporation as a party to the "bullet jacket" agreement. It appears from affidavits of the defendants that the Wire and Metal "group" consists of three corporate entities, Wire and Metal Specialties Corporation, G. G. Greene Incorporated and G. G. Green *Corporation*. G. G. Greene Corporation (not a party here) sold all its assets and inventory to Wire and Metal in 1963, and has been "dormant" since that time. G. G. Greene Incorporated has engaged in no business activities and has been "dormant" for more than ten years, and has no assets. The affidavits do not establish whether there was ever any sale of the assets of G. G. Greene Incorporated to Wire and Metal or any other corporation. Grant G. Greene is the Vice President of both Wire and Metal and G. G. Greene Incorporated. Lynn D. Freeman is the President of Wire and Metal and the Vice President of G. G. Greene *Corporation*.

Documentary evidence of the involvement of the G. G. Greene corporations in the bullet jacket agreement includes the following:

1. An invoice in the amount of $9000, a "packing list" recording the shipment of a "cup punch die" and a "draw die," and a "record of shipment" of 6626 lbs. of copper clad coils, all bearing the name "G. G. Greene Corporation" and all addressed to Metal Systems. The last form bears the handwritten words, "returned per our Mr. Lynn Freeman."

2. A "shipping order" recording the shipment of 4733 lbs. of copper clad steel coils and 2396 lbs. of copper clad steel scrap from G. G. Greene Incorporated to Metal Systems, and bearing the handwritten words "verbal Freeman" in the column labeled "Customer's Order Number."

The forms of both G. G. Greene Incorporated and G. G. Greene Corporation bear identical stylized "G. G. Greene" trademarks.

The use by Wire and Metal of G. G. Greene forms is explained by the defendants as follows:

"I have been advised, that on occasion old shipping order forms bearing the name of G. G. Greene Incorporated have inadvertently been used by employees of Wire and Metal Specialties Corporation in the conduct of its busi-

ness. If this is so, it was done without the knowledge or consent of G. G. Greene Incorporated."

—affidavit of Grant G. Greene, Vice President of G. G. Greene Incorporated.

"Under the terms of the sale and assignment (of the assets and inventory of G. G. Greene Corporation to Wire and Metal), because of the good will of the name of G. G. Greene, the corporation, G. G. Greene Corporation acted as a sales conduit for Wire and Metal Specialties Corporation, receiving orders and inquiries which it turns (sic) over to Wire and Metal Specialties Corporation. Some billings for these orders were made under the name of G. G. Greene Corporation and when checks were received they were endorsed and turned over to Wire and Metal Specialties Corporation."

—supplemental affidavit of Lynn D. Freeman, Vice President of G. G. Greene Corporation.

■ Notwithstanding any private transfers of assets or any other arrangements among Wire and Metal and the two G. G. Greene corporations, the defendants must bear the consequences of any representations as to corporate identity communicated to third parties in the ordinary course of business. It appears to the court that Metal Systems could have reasonably concluded, on the basis of the receipt of the above-described correspondence, and through failure of individuals occupying executive positions in more than one corporation to clarify their roles, that G. G. Greene Incorporated was a party, jointly with Wire and Metal, to the bullet jacket agreement. The court does not now rule that liability of G. G. Greene Incorporated shall be coextensive with the liability, if any, of Wire and Metal. However, an abundance of caution dictates that G. G. Greene Incorporated not be released as a party at this stage of the proceedings. The contacts of G. G. Greene Incorporated with the state of Rhode Island shall be considered synonymous and identical with those of Wire and Metal for the purposes of the instant motion to dismiss. The court will reconsider its ruling with respect to G. G. Greene Incorporated should further facts, as developed at trial, warrant such reconsideration.

### Service of Process

The record of Civil Actions Nos. 4730 and 4731 shows that on the plaintiffs' Motions for Substituted Service the court entered orders prescribing the manner for such service of process, all in keeping with Sec. 9–5–33, Gen.Laws R.I.1956, as amended, and Rule 4(d) (3), Federal Rules of Civil Procedure, 28 U. S.C.A. The court is convinced that there was compliance with said orders.

The motions to dismiss of the defendants are hereby denied.