E. F. HUTTON & CO., INC. and New York Securities Placement Corporation

v.

TOURISM AND DEVELOPMENT CORPORATION

v.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF LARGO.

Civ. A. No. 75–0169.

United States District Court, D. Rhode Island.

Aug. 4, 1978.

Leonard Decof, Providence, R. I., for plaintiffs.

Richard M. Borod, of Edwards & Angell, Providence, R. I., for Tourism.

John A. Murphy, Providence, R. I., for First Federal.

## MEMORANDUM AND ORDER

PETTINE, Chief Judge.

Tourism & Development Corporation (Tourism), a Rhode Island Corporation, joined First Federal Savings and Loan Association of Largo (First Federal), a Florida Corporation, as party defendant; First Federal now moves pursuant to the provisions of Rule 12(b)(2) of the Fed.R.Civ.P. to dismiss this action and to quash service of process claiming that this Court lacks in personam jurisdiction over it.

The controversy centers around financing arrangements between the parties for a proposed Jai Alai facility in Newport, Rhode Island. On April 3, 1974, the plaintiff E. F. Hutton & Co., Inc. (Hutton), a New York Corporation from New York, phoned First Federal in Florida soliciting financing for Tourism; and as a result of this conversation, Hutton mailed to First Federal a completed loan application signed by Allen Catlow, President of Tourism. First Federal approved this loan application at a meeting of its loan committee held in Florida on April 5, 1974; on April 8, 1974, First Federal issued a letter of commitment to Hutton for a $5,000,000 loan to Tourism conditioned on the fulfillment of certain requirements cited in the letter and the payment of $55,000 by Tourism. On April 10, 1974, Hutton and the New York Security Placement Corporation entered into a contract with Tourism for the arrangement of financing for the Jai Alai facility whereupon Hutton presented First Federal's commitment to Tourism. On the same date of April 10, a phone conversation between the senior vice president of First Federal in Florida and the executive vice president of Tourism in Rhode Island took place concerning certain appraisals and other aspects of the project. On April 18, 1974, Tourism mailed the $55,000 commitment fee to First Federal in the form of a check drawn on the First Bank and Trust Company of Providence, Rhode Island. This check was subsequently cashed by First Federal. On May 14, 1974, Tourism mailed to First Federal information requested by First Federal, which information was supplemented by another letter from Tourism to First Federal on June 3, 1974. On June 7, 1974, First Federal wrote to Tourism stating that further information was needed for approval of the property in Rhode Island on which the project was to be constructed. Following this last letter, there was a series of phone calls; namely, June 13, 1974 from First Federal to Tourism; June 17, 1974, a telephone conversation, between the executive vice president of First Federal and the President of the Newport National Bank, Newport, Rhode Island, concerning the Jai Alai resulting in the President of the Newport National Bank mailing to First Federal news articles concerning the Jai Alai, and

copies of the Newport National Bank December 1973 statement and statement of Old Colony Co-operative Bank, their major stockholder; June 19, 1974, a phone conversation between a Rhode Island newspaper reporter and an officer of First Federal concerning the likelihood of success such a project would have in Rhode Island. This is the sum total of the contacts that were made with the State of Rhode Island. The loan in question was never made.[1]

First Federal is a government-chartered savings and loan association in Pinellas County in the State of Florida, and though it argues its entire operation is within that state, the record shows it has engaged in extensive interstate real estate financings. An itemized list of financings for the years 1972–1975 inclusive, of real estate properties located outside Florida show it committed $35,478,300 with a paid amount of $26,889,534.04. This same pattern of interstate business was practiced in this case with the necessary interstate correspondence and phone conversations to effectuate the financial arrangement sought by the parties.

The Rhode Island "long-arm" statute, § 9–5–33, Gen.Laws R.I.1956 as amended, is the statutory basis for this Court's jurisdiction over the non-resident defendant. "[F]rom the plain language of the statute it will be seen that the legislature of Rhode Island has chosen to exercise jurisdiction over foreign corporations up to the constitutional limitations." *Del Sesto v. Trans World Airlines, Inc.,* 201 F.Supp. 879 (D.R.I. 1962). The Rhode Island Supreme Court reaffirmed this position in *Conn. v. ITT Aetna Financing Company, et al.,* 105 R.I. 397, 252 A.2d 184 (1969), writing:

The long-arm statute . . . made foreign corporations and nonresident individuals having the necessary "minimum contacts" with this state amenable to the jurisdiction of our courts subject only to whatever limitations might be imposed

by the constitution or laws of the United States; in substance and in effect, it empowers our courts " . . . to exercise jurisdiction over foreign corporations up to the constitutional limitation." [citing *Del Sesto v. Trans World Airlines, Inc., supra* ].

In *Scott Brass, Inc. v. Wire and Metal Specialties Corp.,* 344 F.Supp. 711 (D.R.I.1972), this Court, quoting the language from *ITT Aetna Financing Co.,* elaborated:

Although the constitutional limitations on in personam jurisdiction are of federal origin, the question of "minimum contacts" for jurisdictional purposes must be decided in accordance with the law of the state in which the court sits, *Westphal v. Stone Manufacturing Co.* (D.R.I.1969), 305 F.Supp. 1187, including the experience of state courts as reflected in reported case law. In *Conn. v. ITT Aetna Finance Company, supra,* the Rhode Island Supreme Court addressed itself, 252 A.2d at 187, to the question of standards for judging "minimum contacts":

(N)either the (long arm) statute nor the decisions from which it stems have given us any readily discernible guidelines for determining what are 'minimum contacts,' or for deciding what is encompassed within 'traditional notions of fair play and substantial justice.' At best these are illusive phrases . . . (T)he task of determining when an exercise of jurisdiction over a nonresident is permissible and when impermissible . . . ' . . . will require an evolutionary process rather than a quick definitive statement, as these terms involve subjective judgments that must be based upon a multitude of variant factors as they are presented in a multitude of cases. The existence or non-existence of the necessary 'minimum contacts' to justify the upholding of personal jurisdiction over foreign cor-

---

1. The plaintiffs have sued Tourism for breach of contract for having failed to pay certain commissions or finders fees due to the plaintiffs for having arranged the financing of the Jai Alai project. Tourism counterclaims alleging that the $55,000 loan commitment fee was paid by mistake to First Federal and that the plaintiffs "knew or should have known" that there was no consideration for the payment. Tourism also joined First Federal as a party defendant to the counterclaim.

porations under the Fourteenth Amendment as interpreted in the *International Shoe Company* case must obviously be worked out with reference to the facts of a particular case rather than in a statement of dogmatic rules of all-inclusive principles.' *Velandra v. Regie Nationale Des Usines Renault,* 6 Cir., 336 F.2d 292, 295.

It is within the frame of this process that we inquire whether (the defendants) had sufficient 'minimum contacts' with this state to permit our courts to exercise *in personam* jurisdiction over them. *Id.* at 713.

■ This court has decided similar jurisdictional issues in a number of cases and each had to be decided on its own facts; for only on a case by case basis can the sufficiency of the minimum contacts be decided. "The totality of the contacts both quantitatively and qualitatively must be considered to the full scope of the periphery of constitutional permissibility," *Westphal v. Stone Manufacturing Co.,* 305 F.Supp. 1187, 1193 (D.R.I.1969). In *Scott Brass, Inc. v. Wire and Metal Specialties Corp., supra,* the Court considered the "substantial commitment to a complicated and long lasting business relationship with two Rhode Island corporations"; in *Leesona Corporation v. Concordia Mfg. Co.,* 312 F.Supp. 392 (D.R.I. 1970), a consideration was whether the defendant "could" or "could not" foresee any possibility of suit in Rhode Island; in *Atlantic Tubing & Rubber Co. v. International Engraving Co.,* 364 F.Supp. 787, 792 (D.R.I. 1972), this Court quoted *Duple Motor Bodies, Ltd. v. Hollingsworth,* 417 F.2d 231, 235 (9th Cir. 1969): "[W]e do not regard it as offensive to fair play or substantial justice or an undue burden on foreign trade to require a manufacturer to defend his product wherever he himself has placed it, either directly or through the normal distributive channels of trade. If it is clearly foreseeable as a result of trade with a foreign state that injury from a defective product (if it occurs) would occur in that state, the hardship of defending the product in that state in our judgment must be assumed as an attribute of foreign trade;"

this Court also referred to the voluntary nature of the contacts: " 'The *Hanson v. Denckla* [357 U.S. 235, [78 S.Ct. 1228, 2 L.Ed.2d 1283] (1958) (voluntary association with the forum state necessary for jurisdiction)] requirement is simply designed to avoid the situation where the "unilateral activity" of the plaintiff can drag an unsuspecting and unwilling defendant into a foreign forum.' " *Atlantic Tubing, supra,* 364 F.Supp. at 793, *quoting In-Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 226 (6th Cir. 1972); and in *Forsythe v. Cohen,* 305 F.Supp. 1194, 1197 (D.R.I.1969), this Court noted the utilization of intermediaries to solicit extra-territorial business as an indication of a wide operational scheme. However, these cases, as decided by this Court, can only be considered if they comport with the learned discussion of the "minimum contacts" issue by Chief Judge Coffin in *Vencedor Mfg. Co., Inc. v. Gougler Industries,* 557 F.2d 886 (1st Cir. 1977). I find nothing in *Vencedor* that constricts or overrules these prior decisions, but rather gives us further guidance in this somewhat elusive area of the law. Taking note of the *Vencedor* teachings, I first heed its admonition that conclusory labels such as "presence" or "purposefully availing" should not replace a practical concern for the facts of each case—that the central concern is fairness. As I see it, this search for fairness first requires an analysis of the business operation at hand because this will bring into play the case by case facts that must be scrutinized and placed in proper perspective to see if they satisfy the various precedents necessary for jurisdiction over foreign corporations "up to the constitutional limitations."

Such an initial inquiry here shows that, in answer to interrogatories, First Federal revealed that the loan commitments, *supra,* extended to different corporations throughout 15 different states. Based on the reasonable inference that each of these loans were not much different from the one at issue here in requiring appraisals, mortgages, etc., with continued supervision, it is not difficult to conclude that First Federal is,

indeed, engaged in a truly interstate operation and in this case did, indeed, contemplate a detailed and extensive involvement with and participation in a Rhode Island project,[2] fully aware that its loan would be used in this state and that certain contract

2. As detailed by Tourism in its memorandum these involvements include:

(ii) *Contemplated contacts*

"On April 8, 1974, FIRST FEDERAL voluntarily issued a 'commitment letter' showing on its face the contemplation of a detailed and extensive involvement with and participation in a Rhode Island project by FIRST FEDERAL.* These expressly detailed involvements include, but are not limited to:

* FIRST FEDERAL itself denoted the subject of the letter as "Stand-By Commitment, JAI–ALAI Fronton and Civic Center, *Newport, Rhode Island*" (emphasis added). The words "Newport" or "Rhode Island" appear five further times in the letter, thus foreclosing any attempt by FIRST FEDERAL to suggest it did not know the intended destination of its "commitment" project. Indeed, the letter expressly identifies "the borrower, Tourism and Development Corporation of Providence, *Rhode Island*" (emphasis added).

a) the approval of a loan application for substantial funds (the lesser of $5.5 million of 75% of the MAI appraised value) after construction of a specific and substantial fronton building in Newport, Rhode Island,

b) the right to review and approve, prior to final commitment, the plans and specifications of the Rhode Island building,

c) the condition that FIRST FEDERAL have a first mortgage lien on the Rhode Island real estate and a first chattel mortgage on the associated removable equipment, as well as conditional assignments of all rents, leases, restaurants and other income at the Rhode Island fronton and conditional assignment of all licenses and authorizations to do business of the Rhode Island facility,

d) the right to approve various surveys of the Rhode Island site, including 'the necessary county, state and governmental authority seals required' to construct the Rhode Island fronton,

e) the right to approve an architect to inspect, both on an interim and a final basis, the progress of construction,

f) the requirement of approval by 'all governmental bodies . . ., including applicable City, County and State Agencies',

g) the condition of deposit with FIRST FEDERAL of 'one-twelfth of the annual real estate taxes and fire insurance coverage' of the Rhode Island real estate,

h) payment of a total of $82,000 to FIRST FEDERAL for its 'commitment' from its Rhode Island borrower, (T&D), expressly identified as such,

i) the condition that the State of Rhode Island Recreational and Building Authority guarantee to FIRST FEDERAL $2 million of the loan,

j) the requirement that the Rhode Island borrower complete a full mortgage application, accept FIRST FEDERAL's 'commitment', send a 'commitment fee' to FIRST FEDERAL and submit additional particulars to FIRST FEDERAL,

k) the requirement that the notes and mortgages be personally endorsed by principals of the Rhode Island borrower and their spouses,

l) an expression by FIRST FEDERAL that it does not intend 'to charge in excess of legally allowable interest under existing statutes of the State of Rhode Island,' ** and

** Because other substantial factors support jurisdiction here, T & D only mentions in passing the provisions in the "commitment letter," to indicate that litigation in the Rhode Island courts obviously "will not upset any contract-based expectations." No provisions established that only the Florida courts could resolve any disputes; indeed, on the contrary everything mentioned Rhode Island laws, licenses, agencies, etc., *Vencedor Mfg. Co., Inc. v. Gougler Industries,* 557 F.2d 886, 893 (1st Cir. 1977). Since the foresight was obviously present, FIRST FEDERAL, had it so desired, "could contractually have limited the venue of any suit," but chose not to. *Leesona Corporation v. Concordia Mfg. Co., Inc.,* 312 F.Supp. 392, 399 (D.R.I.1970). *See also*: *In-Flight Devices Corporation v. Van Dusen Air, Inc.,* 466 F.2d 220, 234, n.24 (6th Cir. 1972).

m) the condition that the FIRST FEDERAL loan 'be originated by a qualified lender in the State of Rhode Island.'

Most of the above contemplated steps, all envisioned to take place in Rhode Island, did not in fact take place, although FIRST FEDERAL did receive $55,000 as it contemplated from Rhode Island, as the first step in the chain of events.*** These expressly contemplated contacts would have extensively involved the Rhode Island financial community, Rhode Island government at all levels, Rhode Island businesses, Rhode Island realty, Rhode Island personality, Rhode Island dollars, Rhode Island inspections, Rhode Island construction, Rhode Island laws, in short, all that a major financing would normally entail."

*** FIRST FEDERAL also received other items, such as a real estate appraisal, loan application, personal resumes of principals, etc., as contemplated by the "commitment letter." *See, supra,* and Answers of First Federal Savings and Loan Association of Largo to the First Set of Interrogatories Submitted to Tourism & Development Corporation, paragraph 4, dated March 17, 1978.

rights would attach. The substantial commitment of *Scott Brass, supra*; suit foreseeability of *Leesona, supra*; defending product in forum where placed by foreign corporation of *Atlantic Tubing, supra*; voluntary association and absence of unilateral activity of *Hanson, supra*; and utilization of an intermediary (Hutton obtaining lender, First Federal) of *Forsythe, supra*, are all present and satisfied here. This being so, then First Federal "may not shield itself from suit by a careful but formalistic structuring of its business dealings." *Vencedor, supra*, 557 F.2d at 891.

The situation here is not much different than as existed in *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). In *McGee,* a policyholder purchased his policy from an Arizona company whose obligations were assumed by a Texas company, International Life Insurance Co. At the time, the policyholder resided in California and there received a reinsurance certificate mailed to him by International from Texas. The policyholder accepted the offer and continued mailing premiums from California until he died. The United States Supreme Court found jurisdiction—there were substantial connections with the state of California. Here, instead of a reinsurance certificate being mailed to Rhode Island, we have documents from First Federal which Tourism had to complete to effectuate the commitment. In *McGee,* premiums were then paid out of California to Texas; here, $55,000 was paid out of Rhode Island to Florida. In fact, it can be argued that here the number of phone calls and various letters makes it a stronger case establishing the necessary contacts for in personam jurisdiction. So we have an interstate lender,[3] First Federal of Florida, obtaining a borrower, Tourism in Rhode Island, through an intermediary Hutton, which affirmatively and voluntarily brought it into this state. In no way was First Federal unsuspectantly drawn into the jurisdictional boundaries of this Court. This conclusion seems undeniable when viewed in light of the Rhode Island commitments contemplated by First Federal, *see* n.2, *supra*.

It would be naive not to conclude that First Federal well knew that its rights in the various phases of this business venture, including the initial commitment, might well be determined outside Florida—namely, in Rhode Island, and that it would be required to defend here. *Atlantic Tubing & Rubber Co. v. International Engraving Co., supra.* Another case in point is *J. Henrijean & Sons v. M. V. Bulk Enterprise,* 311 F.Supp. 417, 421 (W.D.Mich.1970), *relied on in Vencedor, supra,* 557 F.2d at 892, where there was a total absence of direct contacts with the forum state, and yet jurisdiction was found. There, the defendant transported steel by barge from New Orleans to Chicago, knowing that the steel was ultimately bound for Michigan. The Court held that the defendant's knowledge of the steel's destination would support jurisdiction in the forum state.

■ Given the direct actual contacts of First Federal with Rhode Island; namely, repeated phone calls, correspondence with forms to consummate the commitment, the cashing of a $55,000 check obtained from Rhode Island and drawn on a Rhode Island bank, the complicated involvement contemplated in the future, and the extensive interstate loan operations of First Federal, I must conclude that all the considerations as set forth in the various cases discussed, *supra,* have been satisfied and therefore, fairness dictates that First Federal be subject to the jurisdiction of this Court; and its motion to dismiss be denied.

So Ordered.

Appendix to follow.

---

**3.** See attached copy of First Federal's answer to interrogatory by Tourism.

## APPENDIX

### LOAN PURCHASES OUTSIDE OF STATE OF FLORIDA

| SELLER | COMMITMENT DATE | PROPERTY LOCATION | COMMITTED AMOUNT | NET PAID | FEE COLLECTED |
|---|---|---|---|---|---|
| **1972 PARTICIPATIONS** | | | | | |
| J. I. Kislak (142 Loans) | 7/18/72 | Ga, Tenn, So. Carolina & Louisiana | $5,000,000.00 | $3,940,577.00 | $50,000.00 |
| United Bank of Denver | 3/02/72 | Colorado | $2,000,000.00 | $1,867,798.57 | $20,000.00 |
| **WHOLE LOAN PURCHASES** | | | | | |
| City National Mortgage Company | 5/01/72 | California | $2,000,000.00 | $ 785,218.78 | $20,000.00 |
| Carolina National #7 | 3/10/72 | So. Carolina | $1,000,000.00 | $ 499,733.02 | $10,000.00 |
| Carolina National #8 | 5/23/72 | So. Carolina | $1,000,000.00 | $ 931,124.09 | $10,000.00 |
| Carolina National #9 | 9/29/72 | So. Carolina | $1,000,000.00 | $ 960,817.16 | $10,000.00 |
| Countrywide Funding #2 | 2/23/72 | California | $2,000,000.00 | $1,953,773.24 | $20,000.00 |
| Croddy Corporation #6 | 2/23/72 | California | $1,000,000.00 | $ 981,938.25 | $10,944.50 |
| Lomas & Nettleton #1 | 5/31/72 | Tenn, No. Carolina Utah, & Nevada | $1,500,000.00 | $1,292,206.34 | $15,000.00 |
| Mason McDuffy #1 | 3/28/72 | Nevada & California | $3,000,000.00 | $2,885,157.90 | $30,000.00 |
| Mortgage Associates of Atlanta #6 | 4/25/72 | Georgia | $ 500,000.00 | $ 472,279.01 | $ –0– |
| Carolina National Mortgage Investment Company | 3/06/72 | So. Carolina | $2,250,000.00 | $ –0– | $22,500.00 |
| Puerto Rico Finance Corp. | June, '71 | Puerto Rico | $1,000,000.00 (November '71–January '73) | $1,044,050.00 | $15,000.00 |
| **1973 PARTICIPATIONS** | | | | | |
| Southmost Savings & Loan #1 | 12/09/73 | Texas | $1,120,000.00 | $1,120,000.00 | $11,200.00 |
| **WHOLE LOAN PURCHASES** | | | | | |
| Colonial Mortgage Company of Alabama #1 | 6/22/73 | Georgia | $1,200,000.00 | $1,185,452.12 | $17,990.00 |
| Puerto Rico Financial Association (57 Individual loans when construction loan converted to indvidual condo loans) | 1973 | Puerto Rico | $2,033,300.00 | $2,033,300.00 | $ –0– |
| **1974 PARTICIPATIONS** | | | | | |
| NONE | | | | | |
| **WHOLE LOAN PURCHASES** | | | | | |
| Redwood National #1 | 4/12/74 | Arizona | $2,000,000.00 | $1,289,765.68 | $20,000.00 |
| **1975 PARTICIPATIONS** | | | | | |
| NONE | | | | | |
| **WHOLE LOAN PURCHASES** | | | | | |
| Mortgage Associates of Atlanta #7 | 7/11/75 | Tenn, Georgia, Kentucky, & No. Carolina | $1,000,000.00 | $ 972,374.55 | $10,000.00 |
| Croddy Corporation #7 | 6/06/75 | California | $1,000,000.00 | $ 945,446.38 | $10,000.00 |
| Countrywide Funding #3 | 7/08/75 | California | $1,000,000.00 | $ 980,616.06 | $10,000.00 |

988

| SELLER | COMMITMENT DATE | PROPERTY LOCATION | COMMITTED AMOUNT | NET PAID | FEE COLLECTED |
|---|---|---|---|---|---|
| WHOLE LOAN PURCHASES—Continued | | | | | |
| Carolina National #10 | 7/18/75 | So. Carolina & Georgia | $ 750,000.00 | $ 722,315.19 | $ 7,500.00 |
| Carolina National #11 | 9/05/75 | So. Carolina & Georgia | $1,000,000.00 | $ –0– | $ 5,000.00 |
| American Mortgage Co. #1 | 12/08/75 | Arizona | $ 500,000.00 | | |
| J. I. Kislak #5 | 11/19/75 | New Jersey, Georgia, Puerto Rico, Delaware & Tenn. | $ 625,000.00 | $ 525,323.72 | $ –0– |