307 F.2d 910
 MOORE-McCORMACK LINES, INC., and Old Dominion Stevedoring Corporation, Appellants,
v.
BUNGE CORPORATION, and H. J. Baker & Bro., Inc., Appellees (two cases).
In the Matter of Willie ALSTON et al., Plaintiffs,
v.
MOORE-McCORMACK LINES, INC., Defendant and Third-Party Plaintiff,
v.
OLD DOMINION STEVEDORING CORPORATION et al., Third-Party Defendants. Civil Action No. 3285.
In the Matter of Solomon BLOW et al., Plaintiffs,
v.
MOORE-McCORMACK LINES, INC., Defendant and Third-Party Plaintiff,
v.
OLD DOMINION STEVEDORING CORPORATION et al., Third-Party Defendants. Civil Action No. 3317.
 No. 8628.
 United States Court of Appeals Fourth Circuit.
 Argued June 15, 1962.
 Decided September 8, 1962.
 
 David P. L. Berry and Harry E. McCoy, Norfolk, Va. (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief), for appellant Moore-McCormack Lines, Inc.
 J. Carrol Fears, Jr., Norfolk, Va. (Parsons, Stant & Parsons and Wolcott, Wolcott & Payne, Norfolk, Va., on brief), for appellant Old Dominion Stevedoring Corp.
 William T. Prince, Norfolk, Va. (Jack E. Greer, and Williams, Cocke, Worrell & Kelly, Norfolk, Va., on brief), for appellee Bunge Corp.
 Harvey E. White, Jr., Norfolk, Va. (White, Ryan & Reynolds, Norfolk, Va., on brief), for appellee H. J. Baker & Bro., Inc.
 Before SOPER, HAYNSWORTH and J. SPENCER BELL, Circuit Judges.
 SOPER, Circuit Judge.
 
 
 1
 These companion cases raise the question whether two New York corporations were subject to process in third-party suits brought against them in the United States District Court for the Eastern District of Virginia at Norfolk. Jurisdiction of the original suits was based on diversity of citizenship. Service of process was made upon the third-party defendants under Title 8-60 and Title 13.1-119 of the Virginia Code of 1950, as amended, which provide in effect that if a foreign corporation transacts business in the state without a certificate of authority process may be served on any director, officer, or agent of the corporation or if none can be found, on the Clerk of the State Corporation Commission. On motion of the third-party defendants the District Judge quashed the service of process and dismissed the cases on the ground that they had done no business in the Commonwealth of Virginia. Interlocutory appeals by the third-party plaintiffs were allowed in accordance with the terms of the statutes.
 
 
 2
 The litigation was begun on August 3, 1960 by the institution of two suits by numerous longshoremen against Moore-McCormack Lines, Inc., the owner and operator of the Steamship MORMACTEAL. It was alleged in the complaints that on January 12, 1959 each of the plaintiffs suffered injuries and damages in excess of $10,000 from inhaling the dust of castor bean pomace from burlap bags in which the cargo of the ship they were discharging had been improperly stowed and contained. Moore-McCormack impleaded the Old Dominion Stevedoring Corporation which undertook to discharge the ship and employed the plaintiff stevedores for this purpose. Moore-McCormack also impleaded the Bunge Corporation and H. J. Baker and Brother, Inc., New York corporations, as third-party defendants. It was alleged in the third-party complaints that Bunge was the owner and shipper of the cargo and that Baker was the consignee and that they failed to have the cargo properly packaged and to give warning of its dangerous character; and it was also alleged that Old Dominion failed to protect its employees in the discharge of the ship. Old Dominion also impleaded Bunge and Baker. The question for decision is whether Bunge and Baker were actually transacting business in Virginia and, therefore, amenable to process in that state, in view of the facts now to be recited which were brought out in answers to interrogatories and in depositions taken upon the motions to quash.
 
 BUNGE'S ACTIVITIES
 
 3
 Bunge was engaged in the importation and exportation of merchandise at the port of Norfolk. In order to handle its importations it employed Cavalier Shipping Company, a Virginia corporation, which represented a number of firms in the importation and exportation of cargo at that port. Cavalier acted for Bunge under power of attorney and cleared the imports through the Customs under a bond filed by Bunge at Norfolk as required by the Custom Service to insure collection of deficiencies.
 
 
 4
 Under this arrangement Bunge imported at Norfolk 184 cargoes of burlap consisting of 49 cargoes in 1957, 39 cargoes in 1958, 46 cargoes in 1959, 24 cargoes in 1960 and 26 cargoes through June 1961. The annual value of these shipments exceeded $100,000 per year. These goods were sold by Bunge, landed in Norfolk duty paid. Title passed when they were paid for on arrival. Some of them it would seem were owned by Bunge and some, as in the case of the cargo of pomace, by a foreign shipper for whom Bunge acted as broker.
 
 
 5
 Bunge's exportations at Norfolk included cargoes of grain and tallow. Records of its grain shipments prior to 1959 were not available, but in that year it exported 3 cargoes of peanut meal and in 1960 2 cargoes of wheat and 1 of corn. In addition, it exported 15 million pounds of tallow in nineteen shipments, comprising one shipment in 1956, one in 1958, three in 1959, eight in 1960 and six through June 1961. These exports were owned by Bunge and sold abroad.
 
 
 6
 In respect to the export of tallow, Cavalier performed services as freight forwarder for Universal Transport of New York City, which had been appointed by Bunge to handle the shipments. The shipments of grain were handled for Bunge by one R. B. Rogers, a freight forwarder in Norfolk.
 
 
 7
 These exportations comprised merchandise which had been purchased by Bunge in the United States and transported to Norfolk where they were loaded for Bunge into vessels to be carried to its foreign customers.
 
 
 8
 Bunge owns no real estate in Virginia and has no mailing address or telephone listing in the state. It has no salesmen or employees in the state.
 
 BAKER'S ACTIVITIES
 
 9
 Baker was engaged in the importation of goods at the port of Norfolk and in forwarding them to purchasers in the United States. It used National Shipping Company, a Virginia corporation, to clear its imports through the Customs and as freight forwarding agent in the transportation of the merchandise to buyers in the United States. In the course of this business Baker caused to be imported and forwarded merchandise of the value of $6800 in 1959, $69,264 in April, 1960, $63,992 in July, 1960, $108,863 in September, 1960, $176,094 in February, 1961, and $189,060 in April, 1961. Baker was the buyer of these goods and secured possession when it paid for them upon delivery in Norfolk. It sold the goods to purchasers in the United States to whom they were forwarded in its behalf by the National Shipping Company.
 
 
 10
 The importation in 1959 was the cargo of pomace which gave rise to this suit. After it was discharged it was forwarded under Baker's instructions in four separate lots to buyers in Virginia and North Carolina — one in Virginia and three in North Carolina. In 1960 there were 17 forwardings of imported merchandise — 14 in Virginia and 3 in North Carolina. In 1961 there were 13 forwardings — 9 in Virginia and 4 in North Carolina. All of these shipments were invoiced in New York.
 
 
 11
 Baker sent employees into Virginia to inspect cargo on two occasions in 1960 and one in 1961. This procedure had occurred two or three times a year for the previous five years. Baker also sent salesmen into the state to solicit orders for fertilizer.
 
 
 12
 The importation of the cargo of pomace and the manner in which it was distributed to buyers in the United States illustrates the kind of transactions in which Bunge and Baker were engaged in Virginia. The cargo was placed on board the MORMACTEAL in Brazil and a bill of lading was delivered to a Brazilian corporation, which was the owner and shipper of the goods and for brevity has been called Sanbra in this case. Sanbra instructed Bunge, its agent in the United States, to sell the cargo and suggested Baker as the buyer. Accordingly, Bunge sold the cargo to Baker for Sanbra's account at actual cost and freight to Norfolk to which port it directed the shipment to be sent as instructed by Baker. The ship arrived on January 12, 1959 and during the discharge of the cargo the stevedores suffered the injuries of which they complain. The bill of lading was forwarded to Bunge for collection, and upon payment of the purchase price by Baker the bill of lading was submitted to Moore-McCormack in New York and it authorized its agents to turn over the goods to Baker. Samples of the goods were taken in Norfolk and forwarded to Bunge and Baker in New York and to chemists in Baltimore. The National Shipping Company cleared the goods through the Customs on behalf of Baker, and transshipped them in accordance with Baker's instructions to its customers.
 
 
 13
 Our problem on this appeal is to decide whether these activities of Bunge and Baker constituted the doing of business or the transaction of business in the state of Virginia so that they may be brought into court as third-party defendants by the service of process upon the Clerk of the State Corporation Commission. It is generally agreed that for long years past there has been a noticeable tendency in the decisions of the courts to expand the scope of their jurisdiction over non-resident persons and corporations. This movement was significantly marked in the decision of the United States Supreme Court in 1944 in International Shoe Company v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, where it was held, in general terms, that substituted service upon a non-resident is valid if he has had such minimum contacts within the state that the maintenance of the suit would not offend traditional notions of due process and fair play; and that in the determination whether such contacts exist the solicitation of business by the employees of the nonresident within the state, which had theretofore been deemed insufficient to establish jurisdiction, may be taken into consideration.
 
 
 14
 This rule was later applied in McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223, where the jurisdiction of a California court was upheld over a foreign corporation whose only contact with the state was the delivery by mail within the state of an insurance policy and the collection of premiums from the insured. The evolution of the law and its culmination in International Shoe Company was well described in these words, 355 U.S. 222, 78 S.Ct. 200:
 
 
 15
 "Since Pennoyer v. Neff, 95 U.S. 714, this Court has held that the Due Process Clause of the Fourteenth Amendment places some limit on the power of state courts to enter binding judgments against persons not served with process within their boundaries. But just where this line of limitation falls has been the subject of prolific controversy, particularly with respect to foreign corporations. In a continuing process of evolution this Court accepted and then abandoned `consent,' `doing business,' and `presence' as the standard for measuring the extent of state judicial power over such corporations. See Henderson, The Position of Foreign Corporations in American Constitutional Law, c. V. More recently in International Shoe Co. v. Washington, 326 U.S. 310, the Court decided that `due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."' Id., at 316.
 
 
 16
 "Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."
 
 
 17
 Again in Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, the court approved the flexible rule laid down in International Shoe Company, but warned that minimal contacts at least are a prerequisite to the exercise of jurisdiction, and held that they were nonexistent in Florida in the case of a trust company located in Delaware where the subject matter of the dispute was the disposition of certain property all of which was held by the trust company outside the state of Florida.[1]
 
 
 18
 The specific point for our decision is, of course, the interpretation placed upon the statutes of Virginia by the Supreme Court of that state. That question, however, was settled for our present purposes by this court in Westcott-Alexander, Inc. v. Dailey, 264 F.2d 853. Judge Haynsworth pointed out in his opinion that the Supreme Court of Virginia in its recent decision in Travelers Health Association v. Commonwealth, 188 Va. 877, 51 S.E.2d 263, affirmed 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154, quoted extensively from International Shoe Company and relied upon its statement of the test of traditional notions of fair play and substantial justice and hence made it abundantly clear that this test should be given great weight in ascertaining in a particular case whether the activities of a foreign corporation within the state were sufficient to subject it to constructive service of process.
 
 
 19
 Obviously, the test is general in its terms and the time-honored phrase that each case must be decided on its own facts is peculiarly applicable. It is quite clear, however, that jurisdiction is not dependent upon the connection of the nonresident defendant with the transaction that gives rise to the suit before the court. What the defendant may have done in the particular case is, of course, relevant upon the question of liability at the trial of the case upon the merits; and it is also relevant but not conclusive upon the question of jurisdiction. The latter must be decided after considering the sum total of the defendant's intrastate transactions.
 
 
 20
 Our examination of the transactions in these cases leads us to the conclusion that both third-party defendants have been engaged in business in Virginia within the meaning of the statute. Bunge was engaged not only as a broker acting for foreign shippers in the importation of merchandise at the port of Norfolk but also on its own account in the importation and exportation of goods owned by it and sold and delivered to its customers through the use of the port's facilities. It is argued that Bunge's activities in Virginia in respect to the goods which it sold as agent or broker for foreign shippers and had delivered at Norfolk were very slight since they consisted only in causing the material to be delivered at the port and, through its agent, entered in the office of the Collector of Customs, and in paying the duty. In a sense this is true since the work did not require the personal presence of Bunge's employees or the maintenance of an office by it in the state. Nevertheless, the contacts were not entirely negligible. The transactions were a necessary part of Bunge's brokerage business without which the sale and delivery of the goods that it had been employed to handle could not have been effected. The activities involved were necessarily performed within the boundaries of the state by the posting of a bond to secure the payment of the duties which Bunge filed on its account, and by the employment of a resident agent under a power of attorney. Even if these actions be deemed insufficient in themselves to justify the statutory service of process they may fairly be considered as a part of the whole setup which we are called upon to appraise. These involve the transactions necessarily performed in connection with the importation and exportation of goods at Norfolk by Bunge on its own account and are clearly of great significance in deciding the question since in size and in number they were substantial and continuous. They constituted a considerable portion of the operations of a substantial business and involved the use of one of the great ports of the United States in the loading, unloading and delivery of cargoes for the benefit of Bunge and its customers. It seems to us that the whole sum of Bunge's activities may fairly be characterized as doing business in Virginia for without them or something similar in Norfolk or other ports on navigable water, the business of Bunge could not have been carried on. We think it is clear that they involve something more than the mere delivery of goods within a state that had been bought from dealers outside of the state, which has been held an insufficient basis for substituted service of process in such cases as Iliff v. American Fire Apparatus Co., 4 Cir., 277 F.2d 360; Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc., 4 Cir., 239 F.2d 502; and Le Vecke v. Griesedieck Western Brewery Co., 9 Cir., 233 F.2d 772. Cf. Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961); Atkins v. Jones & Laughlin Steel Corp., 258 Minn. 571, 104 N.W.2d 888 (1960).
 
 
 21
 The activities we have described were the activities of Bunge and Baker although they were performed by their corporate agents and not by individual employees in Virginia. At all times the local Virginia corporations were subject to their direction in the transaction of the business.
 
 
 22
 We need not repeat what we have said in order to show that Baker was also engaged in such activities in the state as subjected it to the local service of process. Its importation of the cargo of pomace above described was done as part of its importing business which was carried on continuously in substantial amount during the years 1960-1961. It was engaged through its agent, National Shipping Company, not only in clearing the importations which it owned through the Custom House but also through the service of its agent in forwarding these goods from Virginia to purchasers in various parts of the United States. The performance of these transactions in Virginia was a necessary and integral part of its business operations and, as in the case of Bunge, justified the service of constructive process under the Virginia statute.
 
 
 23
 The judgments of the District Court are reversed and the cases are remanded for further proceedings.
 
 
 24
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 In view of these decisions the decision of People's Tobacco Co. v. American Tobacco Co., 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587 (1918), upon which the third-party defendants rely, may no longer be considered as controlling