**IN-FLIGHT DEVICES CORPORATION,**
Plaintiff-Appellant,

v.

**VAN DUSEN AIR, INCORPORATED,**
etc., Defendant-Appellee.

No. 71-1948.

United States Court of Appeals,
Sixth Circuit.

Aug. 10, 1972.

Robert J. Sidman, Mayer, Tingley, Hurd & Emens, Columbus, Ohio, for plaintiff-appellant; Dwight I. Hurd, Columbus, Ohio, on brief.

James S. Monahan, Porter, Stanley, Treffinger & Platt, Columbus, Ohio, for defendant-appellee.

Before PHILLIPS, Chief Judge, CELEBREZZE, Circuit Judge, and Mc-ALLISTER, Senior Circuit Judge.

CELEBREZZE, Circuit Judge.

In March 1971, In-Flight Devices, Inc. brought suit against Van Dusen Air, Inc. in the United States District Court for the Southern District of Ohio. In-Flight's complaint set forth claims of breach of contract and damage to business reputation assertedly resulting from Defendant's conduct.

In-Flight is incorporated under the laws of, and has its principal place of business in, Ohio. Van Dusen is incorporated under the laws of Minnesota and has its principal place of business within that State. Jurisdiction over the subject matter of the action properly was predicated upon diversity of citizenship, 28 U.S.C. § 1332. Service of process upon Defendant was made by certified mail sent to, and received, at Defendant's Minneapolis headquarters.

In the District Court Van Dusen moved to dismiss the action on the ground that the Court lacked personal jurisdiction over it. After considering affidavits and briefs filed by the parties, the District Court granted Defendant's motion and dismissed the case. This appeal followed.

The factual pattern giving rise to the present jurisdictional dispute is not a complicated one, although unresolved questions of fact do exist.

In-Flight Devices is a manufacturer of airplane parts. Its offices and plant are located in Columbus, Ohio. Van Dusen Air, Inc. is a distributor of airplane parts with headquarters in Minneapolis, Minn. and a purchasing operation centralized in St. Louis, Mo. Through a network of wholly owned subsidiaries Van Dusen sells airplane parts throughout the country. Van Dusen, is not licensed to do business in Ohio, nor does it have a resident agent within that State. It does, however, control a wholly owned subsidiary known as Van Dusen Aircrafts Supplies, Ohio Div., Inc. [hereinafter referred to as "the Ohio subsidiary"] which is a corporation organized under the laws of the State of Ohio and having as its principal place of business, Vandalia, Ohio. The Ohio subsidiary is one of the links in the Van Dusen Distribution chain, purchasing parts from the parent corporation and reselling the parts to retail dealers.

In May, 1970 Van Dusen and In-Flight began negotiations directed toward Van Dusen's purchase of 1000 aircraft "transponders" at a total purchase price in excess of $200,000.00. On May 6th of that year the president and several other officers of In-Flight flew to Minneapolis where they discussed the proposed deal with Van Dusen Air's president. Later that same day the In-Flight officers flew to St. Louis, Mo. where they had further discussions with Van Dusen's Vice-President in charge of purchasing, Paul J. Bingaman. At the conclusion of these talks, Bingaman gave

the In-Flight officers a hand drawn purchase order for the transponders.

Still later on that same day, however, the In-Flight officers were asked to meet with F. J. Modz, Regional Manager of Van Dusen Aircraft Supplies, Midwestern Division (another Van Dusen subsidiary with a main office in Chicago, Ill.). The meeting with Modz took place in Vandalia, Ohio—a city in which Van Dusen's Ohio subsidiary had its offices.

There is considerable dispute between the parties as to precisely what occurred at this Vandalia meeting.[1] Plaintiff-Appellant maintains that Frank Modz was a member of the "Central Purchasing Committee" of Van Dusen and that Modz' approval of the contract terms was a prerequisite to the final acceptance of those terms by Van Dusen. It is asserted that Modz, in fact, did not agree to the terms as presented and secured a further 10% discount for his Company at the meeting held on the evening of the 6th.

Defendants-Appellees deny Modz had any power to approve or disapprove the contract terms worked out in St. Louis. They acknowledged that Modz discussed the 10% cash discount with the In-Flight representatives, but assert that Modz was simply discussing "his understanding of [Van Dusen] policy which was to attempt to obtain an additional 10% discount on subsequent orders of new lines of equipment. . . ." Van Dusen asserts that the 10% discount

which did appear in the final typed purchase order issued in July was agreed to in Minneapolis before the Modz meeting although it was not written into the handwritten purchase order which emerged from the St. Louis and Minneapolis sessions.

While considerable uncertainty exists on the question of whether or not the May 6th meeting with Modz in Vandalia, Ohio, represented a negotiating session, it is undisputed that plans for the delivery of the Starlight transponders involved in the present suit and detailed discussion of operational features of such transponders took place at the Ohio meeting.[2]

After the May 6th meetings performance on the contract was begun at In-Flight's Columbus, Ohio plant. Eventually, In-Flight began to ship transponders from its Columbus factory (F.O.B. Columbus) to Van Dusen's St. Louis purchasing center. Occasional rush orders were sent directly to the Van Dusen subsidiaries involved in the actual sale of the transponders to retailers. One such delivery was made to the Ohio subsidiary located in Vandalia, Ohio.

On January 12, 1971, Van Dusen issued a check drawn upon a Minnesota bank as partial payment for its transponder order. Three days later it stopped payment on the check, alleging that the merchandise delivered to it was unsatisfactory. In-Flight claims that it had used the check to cover several of its

---

1. Under appropriate circumstances it might prove essential to resolve the conflict between affidavits by a hearing on the factual questions presented. Such resolution could come at a pre-trial hearing authorized by Rule 12(d) Federal Rules of Civil Procedure, or if the issues are intimately connected with substantive questions involved in the case such resolution could be deferred until the trial in chief. See 2A Moore's Federal Practice § 12.16, 2352–2357; cf. O'Hara International Bank v. Hampton, 437 F.2d 1173 (7th Cir. 1971); United States v. Montreal Trust Co., 358 F.2d 239, 242 n. 4 (2d Cir. 1966). Though for diametrically opposed reasons we, like the District Court, believe resolution of the factual conflict

relevant to jurisdiction is unnecessary here. See note 24, infra.

2. It should also be noted that the president of Van Dusen Air, Inc. made several trips to In-Flight's Columbus plant, apparently during the period the contract was being performed. The purposes of these trips were, according to affidavits submitted by Van Dusen, "to discuss plaintiff's general business policy, its products and its product distribution system." Production facilities were observed by the Van Dusen official on each of the trips but no "contract, commitment or . . . offer to purchase plaintiff's electronic aviation products" was made during these trips.

outstanding bills and that the subsequent stop payment order resulted in considerable commercial embarrassment. Its suit sought recovery for both breach of contract and damage to business reputation.

▇ It is settled law in this Circuit that a federal court sitting on a diversity matter must look to the law of the forum state to determine the extent of its in personam jurisdiction. Southern Machine Co. v. Mohasco Industries, Inc., 401 F.2d 374, 376 n. 2 (6th Cir. 1968); Velandra v. Regie Nationale Des Usines Renault, 336 F.2d 292 (6th Cir. 1964); Smartt v. Coca-Cola Bottling Corp., 318 F.2d 447 (6th Cir. 1963).[3] Plaintiff-Appellant asserts that Ohio law provides for jurisdiction over Van Dusen under the circumstances of this case under Ohio Revised Code § 2307.382.[4] It also asserts that the exercise of such jurisdiction over Van Dusen is consistent with the due process clause of the Constitution. We now examine the accuracy of these assertions.

Although the Ohio act has not been construed authoritatively by the courts of that State, we are not without guidance as we seek to ferret out the meaning of the legislation. The statute substantially parallels Section 1.03 of the Uniform Interstate and International Procedure Act, which in turn is composed

in part of statutory provisions previously adopted in other states.[5] See, Comment to § 1.03, "A Uniform Interstate and International Procedure Act," in Handbook of the National Conference of Commissioners of Uniform State Laws (1962), p. 219 et seq. [hereinafter cited as, Uniform Act Comments, Handbook]. As the Comments to the Uniform Act (written long before the adoption of the Ohio act) make clear, the various bases for jurisdiction set forth in the statute exist independent of one another and must be separately considered.[6]

▇▇ Appellants have relied on Subsection (A)(1)—the transacting any business subsection—as the principal basis for the District Court's assertion of jurisdiction in this case. Theoretically, we have to answer two separate questions with regard to this subsection: How far did the legislature intend the "transaction of any business" jurisdiction to extend? and (2) Is such extension consistent with due process? See Southern Machine Co. v. Mohasco, Industries, Inc., supra, 401 F.2d at 376. Here our real task is simpler since we can conclude that the Ohio legislature intended to extend the jurisdiction of its courts to the Constitutional limits with respect to subsection (A)(1). We come

---

3. It is also clear that out of state service of process is authorized in the federal courts where the law of the forum state makes provision for such service (and where such service is consistent with due process). Rule 4(d)(7), 4(e), 4(f), Fed. Rules of Civil Procedure. While Ohio Rule of Civil Procedure 4.3 authorizes the use of certified mail service, upon non-resident defendants, such service is effective only where a valid basis for in personam jurisdiction over the defendant exists, as the Ohio Rule implicitly recognizes. This opinion considers the question of whether or not the appropriate jurisdictional basis exists in this case.

4. In relevant part Ohio's long-arm statute (Rev.Code § 2307.382) provides:

   (A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;

\* \* \* \* \*

(3) Causing tortious injury by an act or omission in this state;
(4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

   (B) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

5. The parallel has been recognized by the District Courts sitting in Ohio. See Seilon, Inc. v. Brema, S.p.A., 271 F.Supp. 516, 518, N.D.Ohio (1967).

6. Uniform Act Comments, Handbook p. 222.

to this conclusion for a number of reasons. Most significant of these is the identity between this subsection and a provision of the Illinois Civil Practice Act,[7] which has been held to extend jurisdiction to the limits of due process. The opinion in which this interpretation of the Illinois provision was set forth, Nelson v. Miller,[8] was widely heralded as a decision of major import. Decided a number of years before the Ohio long-arm statute was enacted, the significance of the construction could not have escaped the Ohio legislators during their deliberations. It is the settled rule in Ohio that when comparable legislation has been construed in other jurisdictions prior to the enactment of the Ohio statute, the interpretation put on the law elsewhere is to be given great weight in construing the Ohio Statute. Schneider v. Laffoon, 4 Ohio St.2d 89, 212 N.E.2d 801 (1965). Applying this rule we find ample reason to believe that in adopting a provision construed to extend jurisdiction to the Constitutional limits the Ohio legislature intended to achieve an identical result.

Our belief in the accuracy of this evaluation of legislative intent is reinforced by the fact that other courts which have passed on the question have come to the same conclusion. Seilon, Inc. v. Brema S.p.A., 271 F.Supp. 516, 518–519 (N.D.Ohio, 1967); Didactics Corp. v. Welch Scientific Co., 291 F.Supp. 890 (N.D.Ohio, 1968).

Given this understanding of the broad scope of Subsection (A)(1) of the Ohio long-arm statute, our attention may properly be focused on a single question: Would a determination that the Defendant transacted business in the State of Ohio so as to render it subject to the jurisdiction of the Ohio courts with respect to a cause of action arising from such transaction violate due process under the facts of this case?

In 1945 the Supreme Court mapped the general contours of due process boundaries with respect to the assertion of jurisdiction over non-residents:

"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that maintenance of the suit does not offend traditional notions of fairplay and substantial justice." International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95.

Since that landmark decision the Supreme Court has made two other highly significant forays into the tangle of in personam jurisdictional principles. In McGee v. International Life Insurance Co.[9] the Court made clear the latitude allowed by the Constitution, holding that due process did not prohibit the exercise of jurisdiction based on the issuance of but a single insurance contract in the forum and the receipt of payments in connection with that policy. The later decision in Hanson v. Denckla [10] suggested the limits of the *International Shoe* doctrine, requiring that a defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State. . . ." if long-arm jurisdiction is to be exercised over him. 357 U.S. 235, 253, 78 S.Ct. 1228, 1240.

While the three Supreme Court decisions have provided an overall framework within which to work they do not provide a mechanical test which can eliminate the need to consider the jurisdictional facts of each case individually, to make judgments as to the substantiality of contacts with the forum state and the fairness and justice of subjecting a

---

7. Ill.Stat.Ann. c. 110, § 17(1)(a).

8. Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673 (1957); cf. Berlemann v. Superior Distributing Co., 17 Ill.App.2d 522, 151 N.E.2d 116 (1958), which deals explicitly with the "transacting any business" sub-section as opposed to the *Nelson* decision's general treatment of the statute.

9. 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

10. 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

specific defendant to the in personam jurisdiction of the forum state.

In an effort to focus the case by case inquiry which must be made by the federal courts in considering the due process limits of a "long-arm" statute, this Court has adopted a three-fold mode of analysis in jurisdictional cases where jurisdiction is predicated upon a single act of the defendant.

"First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable." Southern Machine Co. v. Mohasco Industries, Inc., supra, 401 F.2d at 381.

■ As must be apparent, this approach simply applies in a specific fashion the broad rule requiring substantial minimum contacts as a basis for jurisdiction.[11] The first and second elements of the method merely involve a search for specific types of contacts which have been held to be essential to the maintenance of jurisdiction in the McGee and Hanson v. Denckla decisions. It is imperative that it be understood that the flexibility, and therein the virtue, of the International Shoe test is retained in the third condition and no mechanical consideration of the first two elements of the test can eliminate the need for an appraisal of the overall circumstances of each case if jurisdiction is to be found.

The first aspect of the Southern Machine approach relating to the "purposeful doing of an act or causing of consequence within the forum state" is clearly derived from the principles enunciated in Hanson v. Denckla. That Supreme Court decision and the Southern Machine decision sought to set forth in somewhat more concrete terms one essential element of the "traditional notions of fairplay" required by International Shoe, supra. An essential element of such "fairness" in our society has always been that a person is not asked to bear a special burden (such as defending in a foreign forum) unless he has done something in a purposeful manner or with such knowledge as to make his deeds the equivalent of purposeful action. The Hanson v. Denckla requirement is simply designed to avoid the situation where the "unilateral activity" of the plaintiff can drag an unsuspecting and unwilling defendant into a foreign forum. See Hanson v. Denckla, 357 U.S. at 253, 78 S.Ct. 1228.

■ With such view of the "purposeful action" requirement in mind, this Court in Southern Machine elaborated on that requirement in terms of the "transacting any business" clause of a long-arm statute. In this Circuit one has "acted" so as to transact business in a state "when obligations created by the defendant or business operations set in motion by the defendant have a realistic impact on the commerce of that state." Such "acts" become purposeful if the defendant "should have reasonably foreseen that the transaction would have consequences in that state." 401 F.2d 374, 382–383.

In some cases, meeting this requirement may pose the most difficult challenge of all for a plaintiff seeking to establish jurisdiction over a non-resident defendant. Here, however, it seems clear that the defendant acted in such a man-

11. See Note, Jurisdiction Over Non-Resident Corporations Based on a Single Act: A New Sole for International Shoe, 47 Georgetown L.J. 42, 352 (1958) ;

For criticism of the Southern Machine approach as being overly restrictive, see Comment, "Long Arm and Quasi in Rem. Jurisdiction and the Fundamental Test of Fairness," 69 Michigan L.R. 300, 312 (1970). The Southern Machine approach has been applied most recently in this Circuit in King v. Hailey Chevrolet Company and Indiana Trailer Supply, Inc., 462 F.2d 63 (6th Cir., June 16, 1972).

ner. Van Dusen entered into contract negotiations involving a substantial order for the manufacture of goods with a firm which it necessarily knew was based in Ohio and had its production facilities located within that State. That the making (and breaking) of a contract with the Plaintiff would have substantial consequences with the State of Ohio is a reality of which Defendant could not have been ignorant. *See,* Comment "Long Arm and Quasi In Rem Jurisdiction" *supra,* n. 11 at 322–25. *Cf.* Jack

O'Donnell Chevrolet, Inc. v. Shankles, 276 F.Supp. 998 (N.D.Ill.1967).

The making of a substantial business contract with a corporation based in another jurisdiction has been held to be adequate to satisfy the requirements of the "purposeful" test of *Southern Machine. See* Simpson Timber Co. v. Great Salt Lake Minerals and Chemicals Corp., 296 F.Supp. 243 (D.Or.1969).[12]

We believe that this holding represents a proper approach.[13] As we have sug-

12. Cf. Royce and Mason, "Non-Resident Jurisdiction in Business Litigation", 53 Chicago Bar Record 100 (Dec. '71), 161 (Jan. '71). The authors conclude that the state courts of Illinois and the federal courts in the Seventh Circuit have placed great emphasis on the establishment of a "business relationship."

> "Unless Illinois has no interest in the matter or the abilities of the parties to litigate in Illinois is disproprtionate the Courts will generally sustain jurisdiction whenever the defendant has voluntarily and knowingly entered into a business relationship with a person in Illinois and could reasonably anticipate that his actions would have consequences in this State." 53 Bar Record 161, 162.

See Ziegler v. Houghton-Mifflin Co., 80 Ill.App.2d 210, 224 N.E.2d 12 (1967).

13. The *Simpson Timber* decision, cited in the text, relied upon the intentional entering into of a business contract with a resident of the forum state as a sufficient basis for the exercise of jurisdiction, at least where the greater portion of performance under such contract was to take place within that state. The Court essentially limited its consideration to the facts of the case before it and did not acknowledge the possibility that such "rule", broadly applied, could create unfairness in many situations.

Fearful of the commercial havoc which a wooden application of the *Simpson Timber* decision could create, several district courts have condemned the conclusion of the Oregon Court, apparently suggesting that merely entering a contract of the sort involved in *Simpson Timber* could never be enough to justify jurisdiction. See McQuay, Inc. v. Samuel Schlosberg, Inc., 321 F.Supp. 902 (D.Minn., 1971) ; Geneva Industries, Inc. v. Copeland Construction Corp., 312 F.Supp. 186 (N.D. Ill., 1970).

While accepting the criticism of *Simpson Timber* contained in the latter decisions, we believe the wholesale condemnation of the general principle announced in that case can accurately be characterized as throwing the baby out with the bathwater.

The intentional entering into a contract relationship with a resident of the forum is an important, but not necessarily decisive, factor in the overall evaluation of jurisdictional propriety. As *McQuay* and *Geneva Industries* point out, it would certainly be unfair to hold consumers answerable in a foreign forum for unpaid bills simply on the basis of a "mail order contract." Similarly, it may be unfair to hold even a small businessman to answer in such forum when he has done no more than fill out a standard order form for a relatively small purchase.

The unfairness inherent in asserting jurisdiction over such defendants can be dealt with under the *Southern Machine* approach without rejecting the idea that entering a contract can, at least, constitute the "intentional doing of an act" required by the first part of that analysis. The third part of the *Southern Machine* approach requires an investigation of the general fairness of the assertion of jurisdiction—and it is at this stage that the consumer—and perhaps the small businessman engaged in intra-state activities can expect to be protected against improper use of the long-arm power. See *Royce* and *Mason, supra,* n. 12 at 166. *Cf.* Currie, "The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois," 1963 Univ. of Illinois L.F. 533, 574–78.

The factors which must go into an evaluation of the fairness of a particular assertion of jurisdiction based upon the entering of a single contract with a resident of the forum state will be discussed later in the text of the opinion.

gested, the purposeful action test is merely a baseline requirement, designed to insure that the defendant has become involved with the forum state through actions freely and intentionally done. It seeks to avoid the assertion of jurisdiction in a situation where all contacts result entirely from a decision made by plaintiff as was the case in Hanson v. Denckla. Certainly the intentional entering into a contractual relationship with a resident of the forum state is sufficient to protect against the Hanson v. Denckla problem and so to meet the purposeful action requirement.

We hasten to add, however, that as a baseline requirement even the presence of a purposeful act within or affecting the forum state in any case involving jurisdictional questions cannot eliminate the

need to complete the analysis required by *Southern Machine* and the Supreme Court cases which are its progenitors. We can properly say this Defendant—by virtue of its intentional entering of a contract to be performed in Ohio—"transacted business" in that State.[14] Whether under all the circumstances of this case jurisdiction can be sustained yet remains to be seen.

We therefore turn our attention to the second phase of the *Southern Machine* approach and pose the question relevant thereto: Did the cause of action asserted arise out of the Defendant's transaction of business in the forum state?[15]

In answering this question we must consider separately the two causes of action set forth by Plaintiff-Appellant.[16]

14. In so holding we of course accept the contention that the Ohio statute's "transacting business" subsection properly may be applied to a single act of the defendant committed within or affecting Ohio. Such conclusion follows naturally from our acceptance of the principles first announced in *Southern Machine*. See 401 F.2d at 384 n. 31; 385 n. 33. *Cf. Didactics Corporation v. Welch Scientific Corp.*, 291 F.Supp. 890, 894–895 (N.D.Ohio, 1968); *Currie, supra,* n. 13 at 565 and cases cited therein.

15. This is, of course, a requirement explicitly imposed by the Ohio statute as well as by due process itself.

16. At least one commentator suggests that it is usually inappropriate for the courts to conduct a separate jurisdictional analysis for each claim raised by a plaintiff: "When a court has jurisdiction over a defendant with regard to one of the plaintiff's claims and the plaintiff has other claims that may be properly joined and that will not impose any additional burden on the defense, there should be no concern with whether jurisdiction may constitutionally be asserted over these less included claims. Jurisdiction should be asserted with reference to the particular fact situation, not with reference to the plaintiff's claims considered in isolation." Comment, "Long-Arm and Quasi in Rem Jurisdiction and the Fundamental Test of Fairness," 69 Michigan L.R. 300, 318 (1970); compare, *Jack O'Donnell Chevrolet, Inc. v. Shankles*, 276 F.Supp. 998, 1002 (N.D. Ill.1967).

There is much merit in this view; considerable inconvenience and expense could be spared by its application in an appropriate case.

It is our reluctant conclusion that this is not such a case. As the Michigan Law Review article itself recognizes, its so-called, "Lesser Included Claim" approach is properly applicable only where assumption of jurisdiction over the second claim does not "impose any additional burden on the defendant," that it does not "involve different factual proofs. . . ." 69 Mich.L.R. at 318, 319. Here very different proof would be required to defend against the contract and tort claims despite the fact that both causes of action have their genesis in the stop payment order issued by defendant.

While both claims involve interpretation of the contract terms, the tort claim also must include evaluation of what damage, if any, was done to plaintiff's business reputation, as well as the foreseeability of injury itself. These are potentially thorny factual questions and the defendant should not be compelled to answer in a forum not otherwise appropriate, simply because the related breach of contract action is to be heard in that forum. (We assume that the exercise of jurisdiction over the contract claim is itself proper. See text *infra*).

Thus we find it necessary in this case to determine separately whether jurisdiction exists over the tort claim. Our evaluation of whether or not it is fair to assert jurisdiction over such claim is not made in a vacuum, however. We are aware of the considerations of convenience and ju-

As to the first—the alleged breach of contract by Defendant—there can be no problem whatever with regard to this second aspect of the *Southern Machine* approach. Defendant's transaction of business in Ohio—its entering of a contractual relationship with an Ohio corporation—is necessarily the very soil from which the action for breach grew. The intimate relationship between the jurisdictional basis and the cause of action necessary to the validity of any single act long-arm jurisdictional assertion cannot be denied here.

The second cause of action relates to the alleged injury to In-Flight's business reputation caused by Van Dusen's stopping of payment on a check issued to satisfy outstanding obligations under the purchase contract. At the very outset of our deliberations on this point we are met by a problem. Can a claim sounding in tort arise from the transaction of business for purposes of the long-arm statute? First examination of the Ohio statute would suggest that it cannot. Two sections are devoted exclusively to jurisdiction over tortious actions and one —subsection (A)(4)—specifically addresses itself to acts committed outside the state (the stopping of the check here, for instance), causing injury within the state. Before subsection (4) can apply it must be shown that the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state." [17] If the only guidance available to us was the familiar rule requiring that the more specific be preferred to the general we would have

to say that a tort claim such as the present one is governed exclusively by subsection (A)–(4) and we, like the District Court would have serious doubts as to the applicability of that section here given the subsection's requirements.

We have been furnished further guidance, however. The comments to the Uniform Act, which Act was adopted in toto (and supplemented with an additional ground for jurisdiction not here relevant) by the Ohio legislature, indicate a definite intention that the result suggested in the last paragraph should not obtain. The comments state: "Each of the subdivisions will support a cause of action *under any theory of law*. For example, a claim arising from 'transacting business' may sound in contract, tort, or quasi contract." Uniform Act Comments, Handbook p. 222. (Emphasis added). In the absence of any suggestion that the Ohio draftsmen desired a result contrary to that contemplated by the Uniform Act, we must assume subsection (A)(1) is intended to cover causes of action sounding in tort.[18]

We recognize that this interpretation is not without problems. It would seem that the relatively strict limits set on jurisdiction over torts by subsection (A) (4) could be effectively circumvented by a broad reading of the expansively drafted subsection (A)(1) so as to include a wide range of tortious acts. The potential scope of the problem is significantly reduced by the fact that jurisdiction under subsection (A)(1) can be invoked only where the cause of action arises from the transaction of business. In many cases the transaction of business within the forum state and the

dicial economy which suggest a common forum for all claims arising from a common factual pattern and we take these considerations into account in making our decision with respect to the tort claim. See, Comments of Uniform Act, Handbook, p. 224; *cf.* Comment, "Long-Arm and Quasi in Rem Jurisdiction," supra, 69 Mich.L.R. 300, 320.

17. Revised Code Section 2307.382(A)(4).

18. The United States District Courts sitting in Ohio have given substantial weight

to the comments to the Uniform Act in general. See Seilon, Inc. v. Brema, S.p.A., 271 F.Supp. 516, 518 (N.D.Ohio 1967); Stewart v. Bus and Car Co., 293 F.Supp. 577 (D.C.1968).

In *Stewart* the District Court specifically entertained the idea that a tort action could find jurisdictional support in subsection (A)(1)—transacting any business within the state. While not required to pass on to the issue the Court implicitly accepted the fact that jurisdiction might exist in such cases.

tortious act may be totally unrelated forcing the plaintiff to rely exclusively on subsection (A)(4).

However, there appear to be situations where subsection (A)(1) reliance would lead to a decision sustaining jurisdiction, while reliance on the narrower subsection (A)(4)—specifically designed to deal with torts—would yield a different result. Allowing such an anomalous result would clearly do violence to the statutory intent. Yet the solution cannot be to hold that subsection (A)(1) contemplates no jurisdiction over any torts whatever. The comments authored by the draftsmen responsible for the statute's form would not support such conclusion.

The answer to the dilemma can be found, we believe, in an investigation of what the statute's draftsmen sought to avoid by the use of the restrictive language of subsection (A)–(4). Again our task has been made easier by the rather explicit comments of the Uniform Act's draftsmen.

"The rule (of subsection (A)(4)) is more restrictive than the Illinois statutes, as interpreted in Gray v. American Radiator and Standard (Sanitary) Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961)." Uniform Act Comments, Handbook p. 223. In the *Gray* decision the Illinois Supreme Court sustained jurisdiction over an Ohio defendant which had manufactured a valve incorporated into a radiator produced in Pennsylvania and ultimately sold to a person injured in Illinois as a result of the radiator's malfunction. In its landmark decision the Illinois court chose to disregard the indirect path by which defendant's product had found its way to Illinois and to sustain jurisdiction over the defendant. The drafters of the Uniform Act and apparently those of the Ohio Act as well drew back from this result. *See* Stewart v. Bus and Car Co., 293 F.Supp. 577, 580 (N.D.Ohio, 1968). The explicit rejection of the *Gray* result by the drafters of subsection (A)(4) suggests that in molding that subsection they were concerned with the same situation as that which concerned the court in *Gray:* The assertion of jurisdiction over a non-resident manufacturer whose allegedly defective goods have produced injury within the state.

The reasons for the drafters' reluctance to follow *Gray* in the products liability field are not difficult to fathom. *Gray* accepted the proposition that a non-resident defendant becomes subject to the jurisdiction of the forum state when he does an act which he should anticipate will involve him with the state in such manner as to make jurisdiction reasonable. The Illinois Supreme Court held that such anticipation or expectation should properly exist whenever a manufacturer puts a product into the stream of national commerce for ultimate interstate distribution. See 22 Ill.2d at 441–443, 176 N.E.2d at 766.

In applying *Gray* many courts have found the requisite expectation of involvement with the forum state in situations where the defendant could not realistically have anticipated that his product would wind up in the particular forum state. In many instances the defendant's expectations have become a construction of the judicial imagination, more fictional than real. See Comment, "Long-Arm and Quasi in Rem Jurisdiction and the Fundamental Test of Fairness," 69 Michigan L.R. 300, 322 (1970). In reaction to this gap between fiction and reality the courts and draftsmen of some long-arm acts have apparently sought to insure that some significant involvement with the forum state exists in those situations, such as the typical products liability case, where the reality of a defendant's expectations may be difficult to gauge. The somewhat restrictive language of subsection (A)(4) of the Ohio Act would seem the result of such approach.

The problem which the limiting language of subsection (A)(4) seeks to deal with simply does not exist, however, in most situations where the non-resident defendant is himself a businessman and has entered a contractual or other commercial relationship with a fellow busi-

nessman after negotiations of any sort. In such situation the defendant surely knows that he is dealing with a resident of the forum state, having dealt directly with him. This contrasts markedly with the situation in *Gray* and other products liability cases where the defendant never comes into direct contact with the specific plaintiff, and may not even know in advance whether any of the millions of potential customers along the product distribution route resides within the forum state. *See* Keckler v. Brookwood Country Club, 248 F.Supp. 645, 650 (N.D.Ill.1965). The distinction between the type of situation involved in *Gray* and that involved in the usual commercial transaction between businessmen persists whether the ultimate cause of action growing out of the commercial relationship is one in contract or in tort, at least so long as any tort action relates to the business substance of the relationship rather than a claim for personal injury or the like.

Given the existence of such a marked distinction between the *Gray* type situation which apparently provided the focus for the restrictions of subsection (A)(4) and the circumstances which obtain in the typical "business tort" case, we believe that both the restrictive intent of the legislature as revealed in subsection (A)(4) and the potentially conflicting intent to make subsection (A)(1) available for tort as well as contract actions can be implemented by holding that subsection (A)(4) does provide the sole basis for long-arm jurisdiction over some, but not all tortious acts committed outside the state and having an effect within the state.

■ To the extent the relationship between the parties parallels that in *Gray*, subsection (A)(4) should provide the exclusive basis for a tort action in order to ensure that the legislature's restrictive intentions with respect to such situation is not thwarted.[19] Where, however, a tort action has its roots in a commercial relationship between businessmen, and where the cause of action relates to commercial aspects of that transaction, jurisdiction may be predicated upon the defendant's transaction of business within the state, regardless of whether the action technically sounds in contract or tort; provided, of course, that the requirements of due process as described elsewhere in this opinion are met fully.

■ Although the Ohio courts and the federal courts sitting in Ohio may assert jurisdiction over a non-resident defendant in connection with a business tort claim where such defendant has merely transacted business within Ohio, the exercise of such jurisdiction could not be held proper under the *Southern Machine* approach unless the particular cause of action in question itself arose from that transaction of business.

The very same act—the stop payment order to Defendant's bank—which constituted the alleged breach of contract here is also the act which Plaintiff alleges constituted tortious misconduct. Both acts and their consequences were made possible only by Van Dusen's transaction of business with In-Flight, by its entering into a contract with In-Flight. Under the circumstances we believe that the cause of action for damage to business reputation grew directly from the transaction of business in Ohio. Such conclusion is consistent with the construction of the long-arm act suggested by the comments to the Uniform Act: "The concept of cause of action or claim for relief should be broadly construed to cover an entire transaction so that, when possible, the entire dispute may be settled in a single litigation. Subdivision (B) is designed to prevent assertion of independent claims unrelated to any activity in subdivision (A) of [the section]." Uniform Act Comments, Hand-

---

19. In many products liability cases a plaintiff may seek to base jurisdiction on subsection (A)(5) of the long-arm act with respect to warranty claims. The availability of such subsection does not undermine the restrictive intent of the legislature with respect to the *Gray* type transaction, however, since the strict requirements of subsection (A)(4) are repeated in (A)(5).

book p. 224. Far from being "unrelated" the claim in question is intimately tied to Defendant's transaction of business in Ohio.

Thus as to both causes of action, two of the three hurdles imposed by *Southern Machine* have been surmounted. The third, and in many ways the most significant aspect of the *Southern Machine* analysis must now be considered: Does the Defendant have sufficient contact with Ohio to make the exercise of jurisdiction over it reasonable?

One aspect of this question must involve consideration of the extent of Ohio's interest in this controversy. *See Southern Machine, supra,* 401 F.2d at 384. It cannot be disputed that a state has an interest in resolving a suit brought by one of its residents. *See Southern Machine, supra* at 385; Thompson v. Ecological Science Corp., 421 F.2d 467, 470 (8th Cir. 1970); Washington v. Hospital Service Plan of New Jersey, 120 U.S.App.D.C. 211, 345 F.2d 105, 108 (1965). That interest necessarily becomes more significant when, as here, a contract calling for substantial production of goods is entered into, with the production of goods and other performance under the contract to take place entirely within the forum state. O'Hare International Bank v. Hampton, 437 F.2d 1173, 1177 (7th Cir. 1971); Seilon, Inc. v. Brema, S.p.A., 271 F.Supp. 516, 520 (N.D.Ohio, 1967); *cf.* Ziegler v. Houghton-Mifflin Co., 80 Ill.App.2d 210, 224 N.E.2d 12, 13 (1967); *Currie, supra* n. 13, 563–579. Holding a defendant answerable for his failure to perform the obligations imposed upon him by such a contract is consistent with Ohio's expressed policy of securing to its businessmen the benefit of their bargains.

The strength of Ohio's interest in resolving the present conflict goes a long way toward resolving the question of whether or not the assertion of jurisdiction over the Defendant here is fair and reasonable. It does not conclude the matter, however. It is apparent that Ohio would have at least some interest in resolving a contractual dispute, for example, between a non-resident consumer and an Ohio mail order company which sought to collect an unpaid bill from the consumer. Yet it is unlikely that the Ohio courts could or should assert jurisdiction over the consumer. *See* Geneva Industries, Inc. v. Copeland Construction Corp., 312 F.Supp. 186 (N.D.Ill.1970); McQuay, Inc. v. Samuel Schlosberg, Inc., 321 F.Supp. 902 (D.Minn.1971). Commentators have recognized the unfairness of asserting jurisdiction over such a consumer, but have been hardpressed to identify the factors leading to such decision. *See Currie, supra,* n. 13 at 574–77; *Royce and Mason, supra,* n. 12 at 165.

We believe the assertion of jurisdiction over the Defendant is fair in this case. We will not attempt to articulate a general standard by which courts may distinguish between the fair and the unfair—the very flexibility of the terms deliberately chosen by the Supreme Court in *International Shoe* precludes the possibility that definitive standards can be created. In an effort to provide at least some assistance to the District Courts which must make the bulk of the jurisdictional decisions, however, we will attempt to set forth some of those considerations which have led us to distinguish this case from the "mail order" situation where the assertion of jurisdiction would, by apparently unanimous consent, be inappropriate.

First we must comment on a superficial similarity between the present situation and the typical consumer collection suit: The status of the defendants as "buyers" in both cases. We do not believe that this similarity requires a common result in the two cases.

Courts frequently have distinguished between buyer and seller in applying long-arm statutes, *see* Oswalt Industries, Inc. v. Gilmore, 297 F.Supp. 307, 312–313 (D.Kan.1969); *cf.* cases collected in Annotation, 20 A.L.R.3d 1201 (1968). Jurisdiction has more often been assumed over non-resident sellers than over non-resident buyers. *See Oswalt, supra.* To an extent the bias reflected in such

fact is justified. *See Currie, supra,* n. 13 at 576.[20] In our economy the seller often initiates the deal, tends to set many, if not all of the terms on which it will sell, and, of course, bears the burden of producing the goods or services, in the course of which production injuries and other incidents giving rise to litigation frequently arise. The buyer, on the other hand is frequently a relatively passive party, simply placing an order, accepting the seller's price and terms as stated in his product advertising and agreeing only to pay a sum upon receipt of the goods or services. It is understandable that sellers more often seem to have acted in a manner rendering them subject to long-arm jurisdiction.

The mere fact that a buyer is the defendant in a long-arm situation should not preclude an assertion of jurisdiction over such defendant, however. *See Currie, supra* at 576; Kropp Forge Co. v. Jawitz, 37 Ill.App.2d 475, 186 N.E.2d 76 (1962). To the extent the buyer vigorously negotiates, perhaps dictates, contract terms, inspects production facilities and otherwise departs from the passive buyer role it would seem that any unfairness which would normally be associated with the exercise of long-arm jurisdiction over him disappears. Such buyer conduct is far more typical in dealings between large business organizations, of course, than in dealings involving consumers or even those involving a small shopkeeper purchaser and a large manufacturer. In the present instance we believe the substantial negotiations over contract terms, the discussions between Defendant and Plaintiff over marketing approaches, the inspection of production facilities by Defendant all suggest that Van Dusen was not simply a passive purchaser. Under such circumstances we do not believe Van Dusen's position as a purchaser should in any way protect it from the grasp of the long-arm. The buyer/seller distinction may have value in general, but only to the extent it is used as a short-hand means of expressing the differences between passive and active involvement in a transaction. Where the passivity characterizing some buyers is absent, as in the case here, the distinction is of little significance.

One factor which has been identified as making the assertion of jurisdiction over a non-resident unfair in a given case is the sense of surprise—the disappointment of expectation—which may result from the use of long-arm jurisdiction.[21] A purchaser who engages in an essentially one state operation—and oc-

---

20. For a recent decision requiring rather substantial contact with the forum by a non-resident buyer before jurisdiction will be sustained, see "Automatic" Sprinkler Corporation of America v. Seneca Foods Corporation, 280 N.E.2d 423 (Mass. Supreme Judicial Court, 1972).

21. As is suggested in the text, a precise definition of "fairness" in the present context is impossible. At least one commentator has attempted to separate some of the factors which may go into any decision on fairness, however.

"Probably the most that can be said in a general way is that due process embodies a test of fundamental fairness in all steps of the proceedings; and that our sense of fairness is outraged by certain assertions of jurisdiction on the part of States unconnected with the parties or with the controversy; and that this sense of unfairness stems partly from the inconvenience and expense involved, partly from the idea of unfair surprise, partly from the anticipation of an improper choice of law, and partly from general notions of the limits of a state's rightful sovereignty." *Currie, supra,* n. 13 at 535.

We are convinced that in the circumstances of this case the assertion of jurisdiction over the Defendant offends none of the interests set forth in this analysis. The considerations of expense and surprise, to the extent we believe them relevant, are discussed in the text above. We believe that any questions raised by the limits of state sovereignty are adequately disposed of by our decision that Ohio has a substantial interest in this controversy.

As to the fourth consideration which *Currie* suggests can lead to unfairness—the possibility that the courts of a particular forum may apply the wrong substantive law in dealing with non-residents—we believe that this danger exists whenever any long-arm statute is applied. *It is*

casionally buys an item or two out of state, for instance, is far more likely to be unprepared to deal with out of state litigation than an individual or corporation whose business frequently involves him or it in interstate transactions.[22] The existence of substantial interstate business in general cannot substitute for some direct contacts with the forum state under the first test of *Southern Machine*, of course, but where such direct contact consists primarily of the entering of a contract with a resident of the forum state by the non-resident defendant the general interstate involvement of the defendant is suggestive of the latter's expectation that it may be involved in litigation far from its home base. Here, the parent Van Dusen Corporation's in-house operations are spread across state lines with its headquarters in Minnesota and its purchasing operations centered in Missouri. Its dealings with its subsidiaries alone—treating such subsidiaries as the independent entities Van Dusen asserts them to be[23] involve dealings with corporate "residents" of states spread across the country. It can hardly surprise Van Dusen or disappoint its general expectations that it is called upon to defend in a forum far from its home base(s).[24]

Just as unfairness may exist when a defendant is unprepared in some psychological sense to defend in a foreign forum it may also exist when he is financially unprepared to defend in such forum.[25] We speak here not merely of inconvenience or of the financial hardship litigation in the forum state may pose, but of the sort of inability to litigate which leads to the acceptance of default judgments. A Minnesota consumer, perhaps even a Minnesota grocery store ordering a product from an Ohio manufacturer may well not be prepared to meet the costs of out of state litigation. Such is not the case with business having a substantial volume of activity outside its home base. Necessarily it is prepared to litigate disputes outside such base area. Van Dusen obviously falls into this latter category and it would not seem that the assertion of jurisdiction over it is unfair in this respect as such assertion over a consumer or small local business might be.

One indicia of fairness which courts have frequently been concerned with is the nature and quantity of the defendant's physical contacts with the forum state. Physical *presence* in the state is not a prerequisite to the assertion of jurisdiction over the defend-

---

no more a threat here than in other cases and we do not consider it to be of significance in determining whether or not unfairness exists in this particular case.

22. See Von Mehren and Trsutman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv.L.Rev. 1121, 1167 (1966). The authors put forth a functional analysis of jurisdictional problems, suggesting that among other factors to be considered in determining whether a court has in personam jurisdiction over the defendant is whether or not such defendant typically participates in interstate business.

23. See note 25 infra.

24. A party in Van Dusen's position desiring to eliminate the possibility of out of state litigation could do so by avoiding any contractual relationship with an out of state resident, of course. A more practical alternative however might be to stipulate in the contract the forum of

choice. In recent years most courts have given effect to such stipulations where the forum chosen is reasonable and the contract involved is not one of adhesion. See, for example, Central Contracting Co. v. Maryland Casualty Co., 367 F. 341 (3d Cir. 1966); but see Indussa Corp. v. S. S. Ranborg, 377 F.2d 200 (2d Cir. 1967). This year it would seem that the Supreme Court gave conclusive sanction to the practice of accepting such stipulations as binding in appropriate circumstances. M/S Bremen and Unterweser, Reederei, GMBH v. Zapata Off-Shore Company, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513, decided June 12, 1972. Although the Supreme Court decision came in the context of a choice between a forum in this country and one in England, the principles announced in it would seem equally applicable to domestic choice of forum questions.

25. *Currie, supra*, n. 13 at 535.

ant. *See* Southern Machine v. Mohasco, *supra,* 401 F.2d at 382. Neither does its existence alone establish a sufficient basis for such jurisdiction, id. at n. 18 and cases cited therein. Nevertheless the nature of the direct physical contacts between defendant and plaintiff may be useful in a close case as a gauge of the significance the parties attach to the events occurring in the forum state and thus of their expectations. A defendant which, like Van Dusen, felt it wise to send its agent into another state to discuss implementation of a contract and to inspect production facilities may be exhibiting a greater involvement with the forum state than a defendant who is content merely to write a letter relating to these matters. Again it must be emphasized that no particular type of physical contact is required as a jurisdictional prerequisite. A letter or a telephone call may, in a given situation, be as indicative of substantial involvement with the forum state as a personal visit by the defendant or its agents. Certainly in an appropriate case the entering of a contract to be performed within the forum state may provide sufficient basis for the assertion of jurisdiction over a nonresident defendant without the physical presence of such defendant or his agents within the state. The presence or absence of the defendant, the nature of its communications with the resident party are relevant to jurisdictional questions—not because of any antiquated idea that physical presence is a jurisdictional prerequisite imposed by the limits of state sovereignty. They are relevant because they provide a clue to the significance attached by the defendant to the activities occurring within the forum state—and thus a clue as to his expectations. In this case we believe the visit paid to Ohio by Mr. Modz on May 6, 1970 and the visits of Van Dusen's president on general inspection trips of Plaintiff's facilities are suggestive of some ongoing concern with Plaintiff's activities in Ohio.[26]

Our emphasis throughout this discussion has been not on providing mechanical rules which can be followed with commendable precision, but on realistic appraisals of the merits of any jurisdictional question. This approach is consistent with the broad language of the long-arm statute we construe and the liberalizing trend in the interpretation of due proc-

---

26. We do not rely on any negotiations which may have taken place in Ohio as support for our decision. It should be noted, however, that substantial contract negotiations taking place within the forum state have been held to be a sufficient basis upon which to predicate jurisdiction. See Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951 (2d Cir. 1967); National Gas Appliance Corp. v. AB Electrolux, 270 F.2d 472 (7th Cir. 1959) cert. den. 361 U.S. 959, 80 S.Ct. 584, 4 L.Ed.2d 542 (1960); Thompson v. Ecological Science Corporation, 421 F. 2d 467 (8th Cir. 1970). *Cf.* Kropp Force Co. v. Jawitz, 37 Ill.App.2d 475, 186 N.E. 2d 76 (1962); Iroquois Gas Corporation v. Collins, 42 Misc.2d 632, 248 N.Y.S.2d 494 (N.Y. Supreme Court, Special Term, 1964). We believe that the negotiations assertedly undertaken in Ohio in this case could provide the basis for jurisdiction if properly established at a fact finding hearing or at trial. Our disposition of this case makes it unnecessary to rely on these negotiations, however.

We note also the presence in Ohio of Van Dusen's Ohio subsidiary. The well established rule is, of course, that the mere presence of a corporate subsidiary does not give jurisdiction over the parent. See Velandra v. Regie Nationale Des Usines Renault, 336 F.2d 292, 296 (6th Cir. 1964). The separation of the parent corporation from the commerce of the state, however, must be real and not merely superficial to insulate it from in personam reach of the state's courts. See Southern Machine, *supra,* 401 F.2d 374, 382 n. 25; Moore-McCormack Lines, Inc. v. Bunge Corporation, 307 F.2d 910 (4th Cir. 1962). The direct purchases made by the Ohio subsidiary, short-circuiting the normal distribution route through the parent, the negotiations carried on for the parent by the officer of another subsidiary and other circumstances suggest that the relationship between parent and subsidiary here may be such as to suggest that the parent forfeited its insulation. We do not believe it necessary to rely upon the subsidiary's activities to support jurisdiction here, however.

**236**

ess which has flowed in the wake of the *International Shoe* decision. We believe it is imperative that courts avoid resort to artificial guidelines which simplify decision making, but obscure the realities of the situation. The courts must consider each long-arm question in relation to traditional notions of fairplay which mark the outer limits of due process.

It is our opinion that the exercise of jurisdiction over the Defendant in this case is permitted under Ohio's long-arm statute [27] and that such extension of jurisdiction does not violate those notions of fairplay defining due process. Accordingly the judgment of the District Court is reversed and the cause remanded for further proceedings consistent with this opinion.

27. Our conclusion that subsections (A)(1) and (B) of the Ohio statute cover all aspects of this case makes it unnecesary for us to construe the other potentially relevant portions of subsection (A) in any great depth.